CECILLIA D. WANG (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

SANJAY NARAYAN (SBN 183227)**
GLORIA D. SMITH (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org
**Counsel for Plaintiff SIERRA CLUB*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO-OAKLAND DIVISION**

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; MARK T. ESPER, U.S. Secretary of Defense, in his official capacity; and CHAD F. WOLF, Acting U.S. Secretary of Homeland Security, in his official capacity,<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Additional counsel for Plaintiffs:

DROR LADIN*
NOOR ZAFAR*
JONATHAN HAFETZ*
HINA SHAMSI*
OMAR C. JADWAT*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org
* *Application for admission* pro hac vice *forthcoming*

MOLLIE M. LEE (SBN 251404)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org

DAVID DONATTI*
ANDRE I. SEGURA (SBN 247681)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
  OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

* *Application for admission* pro hac vice *forthcoming*

**INTRODUCTION**

1.     Multiple courts have ruled that President Donald Trump has no authority to spend billions of dollars, appropriated by Congress for the military, to carry out his campaign promise to build a wall along the U.S.-Mexico border. Rather than abide by these decisions, President Trump is now diverting even more congressionally-appropriated military funds to border wall construction.

2.     Although President Trump has demanded that Congress appropriate billions of dollars to fund his wall project, Congress has consistently rejected his demands. For each of the last two fiscal years, Congress has decided that only $1.375 billion should be spent on any border barrier construction. Most recently, on December 20, 2019, President Trump signed into law Congress's Consolidated Appropriations Act, 2020, enacting Congress's decision that only $1.375 billion should be spent on the border wall in fiscal year 2020.

3.     Beginning in February 2019, the executive branch has unlawfully sought to divert billions of dollars appropriated for the military to aggrandize the border wall project. On February 15, 2019, President Trump signed the Consolidated Appropriations Act, 2019, but simultaneously declared a national emergency in an effort to spend billions beyond what Congress allocated. That same day, the White House announced that the executive branch would spend $3.6 billion in military construction funds and $2.5 billion in other military funds on the border wall. This court found both of those diversions unlawful.

4.     Defendants have continued with this course of conduct in fiscal year 2020. In spite of Congress's decision to fund only $1.375 billion for wall construction for this fiscal year, on February 13, 2020, Secretary of Defense Mark T. Esper announced that the Department of Defense (DoD) would fund $3.831 billion in border wall construction using fiscal year 2020 funds.

5.     On the same day Secretary Esper announced that DoD would divert $3.831 billion to border wall construction, President Trump announced that he was extending the national emergency he had declared in 2019 in a further effort to try and circumvent Congress's funding decisions.

6.     Neither a declaration of emergency nor the military funding statutes the administration has invoked permit the executive branch to disregard Congress's enacted

appropriations legislation. The executive branch has no authority to spend money without congressional approval, and its continuing efforts to do so are unlawful and violate the Constitution.

7.     Plaintiffs Sierra Club and Southern Border Communities Coalition are harmed by the President's unlawful declaration of a national emergency and bring this action seeking declaratory and injunctive relief and other remedies as set forth below.

## JURISDICTION AND VENUE

8.     This case arises under the Consolidated Appropriations Act of 2020, Pub. Law No. 116-93; Article I, section 9, clause 7 of the U.S. Constitution; Article I, section 7 of the U.S. Constitution; the National Environmental Policy Act, 42 U.S.C. § 4332; the Administrative Procedures Act, 5 U.S.C. §§ 701–706, and other acts of Congress. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1361 (mandamus), 1651 (All Writs Act) and 2201 (declaratory relief).

9.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity and (1) at least one plaintiff resides in this district; and/or (2) a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

10.     Plaintiff Sierra Club is incorporated in the State of California as a nonprofit public benefit corporation with headquarters in Oakland, California. Sierra Club is a national organization with 67 chapters and more than 825,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Many of Sierra Club's members reside, work, engage in recreational activities, and/or enjoy areas along the border of the United States and Mexico. Sierra Club has more than 400,000 members in California, over 9,700 of whom belong to its San Diego Chapter. Sierra Club's Grand Canyon Chapter, which covers the State of Arizona, has more than 16,000 members. Sierra Club's Rio Grande Chapter includes over 10,000 members in New Mexico and West Texas. Sierra Club's Lone

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Star Chapter, which covers the State of Texas, has more than 26,100 members, more than 440 of whom live in the Lower Rio Grande Valley.

11. Sierra Club's nationwide advocacy includes educating and mobilizing the public on issues of habitat destruction, divided local communities, land use, and myriad other human and environmental impacts associated with border wall construction activities. Sierra Club is committed to the protection of threatened and endangered species that inhabit the areas surrounding the proposed border walls as well as their habitat. Sierra Club has been actively involved in protecting habitat along the southern border for many years, including work to promote conservation on state, federal, and private lands along and adjacent to the border, and its members regularly use and enjoy areas along the border. Sierra Club members live near and regularly visit the California-Mexico border around San Diego for hiking, birdwatching, photography, and other recreational and aesthetic uses, and have worked to promote conservation of wildlife and habitat along the border.

12. Sierra Club brings this action on its own behalf and on behalf of its members. Sierra Club members live near and frequently visit the parks, refuges, and other public lands along the United States-Mexico border for hiking, birdwatching, photography and other professional, scientific, recreational, and aesthetic uses. Sierra Club members also reside, work, and engage in recreational activities in and around cities and towns affected by the border wall.

13. Sierra Club's members obtain recreational, professional, scientific, educational, and aesthetic benefits from their activities in these areas, and from wildlife dependent upon habitat that includes these areas. Sierra Club and its members have been and will continue to be injured by the construction of a border wall and related infrastructure. Such injuries are particularly significant because the U.S. Department of Homeland Security is proceeding with border work without first complying with decades-old environmental and public safety laws and regulations that were enacted for the very purpose of protecting the places, species, and values Sierra Club members work to protect. The requested relief will redress these injuries.

14. Sierra Club has devoted and continues to devote substantial resources to advocacy opposing the Department of Homeland Security's border wall construction, intended to avoid the injuries to Sierra Club's interests described above. Those efforts include formation of Sierra Club

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Borderlands, a coalition intended to investigate the environmental and social impacts of the border wall, and educate the public regarding those impacts. Sierra Club also devoted substantial staff and other resources towards legislative advocacy leading up to the appropriations bill passed by Congress in February 2019, specifically directed towards securing Congress's denial of substantial funding to the border wall. Because of President Trump's emergency declaration, Sierra Club has been forced to redirect resources to continue and amplify its advocacy—despite Congress's decision to limit funding for near-term construction. For example, Sierra Club has allocated staff and volunteers within its national headquarters in Oakland to support veterans who intend to travel to Texas to oppose continued wall construction.

15.     Plaintiff Southern Border Communities Coalition ("SBCC") is a program of Alliance San Diego, a nonprofit public benefit corporation with headquarters in San Diego, California. SBCC brings together 60 organizations from California, Arizona, New Mexico, and Texas to promote policies and solutions that improve quality of life in border communities, including fair border enforcement policies that respect human dignity and human rights and prevent loss of life, as well as rational and humane immigration-reform policies affecting the border region. Additionally, SBCC engages in oversight of U.S. Customs and Border Protection and its components, including Border Patrol, and advocates for accountability and transparency in the government policies and practices that impact border communities.

16.     SBCC brings this action on behalf of its members and on its own behalf. SBCC's members live in and around the border lands impacted by the President's declaration of a national emergency, in California, Arizona, New Mexico, and Texas. They engage in recreational activities in and derive other benefits from public lands, including areas for which border barrier funding has not been appropriated or for which the deployment of funds has been prohibited. The ongoing and imminent construction of border infrastructure, including the border wall and fencing, will restrict members' access to these and other lands, degrading their quality of life. It has additional negative consequences: dividing and fragmenting the communities in which SBCC members live; dividing the binational character of these communities by increasing members' fears about traveling back-and-forth across the border; heightening racial division and promoting hostility towards immigrants

and communities of color in border communities; and decreasing eco- and other forms of tourism that generate significant revenue.

17.     President Trump's declaration also exposes SBCC's membership to heightened risk from flooding, as well as risks to clean water, clean air and other natural resources. These threats are magnified by the government's refusal to comply with constitutional and statutory limits on construction. The border wall directly harms members economically, culturally, recreationally, aesthetically, and religiously. The requested relief would redress these injuries.

18.     Further, the declaration of a national emergency and the improper diversion of funds has already and will continue to impair SBCC's mission and divert SBCC's resources. SBCC has mobilized its staff and its affiliates to monitor and respond to the diversion of funds and the construction caused by and accompanying the national emergency declaration. It has organized, supported, or participated in grassroots advocacy to respond to ongoing and imminent construction throughout the border lands, including in San Diego, Tucson, Las Cruces, El Paso, and the Rio Grande Valley, and will continue to do so in response to new construction caused by the President's declaration. SBCC has responded locally and nationally to the President's declaration to highlight the impacts it will have on border communities. It has engaged in rapid-response political outreach and advocacy, including traveling to Washington, D.C., to educate legislators about the perils to border communities of the construction caused by and accompanying the national emergency declaration. It has responded to several calls from local officials, communities of faith, members of Congress and congressional staff, and the public about the President's national emergency declaration and the impacts it will have on the border lands and on border communities. In doing so, it has provided information, guidance, and support to organizations and individuals that depend on SBCC, and has led tours for groups requesting to see for themselves the "national emergency" that has been proclaimed. Since the President's declaration of emergency, these activities have consumed the majority of SBCC staff's time, thereby interfering with SBCC's core advocacy regarding border militarization, Border Patrol law-enforcement activities, and immigration reform. SBCC must take these actions in furtherance of its mission to protect and improve the quality of life in border communities.

19. Defendant DONALD J. TRUMP is the President of the United States, and is sued in his official capacity.

20. Defendant MARK T. ESPER, Secretary of Defense, is sued in his official capacity. Secretary Esper is responsible for ensuring that Department of Defense actions comply with applicable laws. Secretary Esper is responsible for carrying out the diversion of military construction funds for the construction of the border wall under President Trump's declaration of national emergency.

21. Defendant CHAD F. WOLF, Acting Secretary of Homeland Security, is sued in her official capacity. Acting Secretary Wolf is responsible for ensuring that Department of Homeland Security actions comply with applicable laws. Acting Secretary Wolf is responsible for carrying out the construction of the border wall and otherwise implementing President Trump's declaration of national emergency.

## FACTUAL ALLEGATIONS

**Congress has considered and rejected the President's requests for billions of dollars in wall funding.**

22. For several years, Congress has considered President Trump's demands for many billions of dollars to construct a border wall, and refused to provide the funds he demanded.

23. Congress's refusal to provide billions of dollars in border wall funding resulted, at the end of 2018, in the longest government shutdown in U.S. history.

24. On January 6, 2019, the Acting Director of the Office of Management and Budget communicated to the congressional Committees on Appropriation that "[t]he President requests $5.7 billion for construction of a steel barrier for the Southwest border," which would "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan." The letter stated that "a physical barrier—wall—creates an enduring capability that helps field personnel stop, slow down, and/or contain illegal entries."

25. On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019. Congress's appropriations judgment, as expressed in the law that passed both chambers, is

that only $1.375 billion should be used to construct a border wall in fiscal year 2019. The House Appropriations Committee Chair, Representative Nita Lowey, confirmed that congressional negotiators considered, and "frankly, . . . denie[d] the President billions of dollars in funding for the concrete wall that he demanded." Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, who was actively involved in negotiations on the 2019 Consolidated Appropriations Act, stated "[t]he agreement does not fund President Trump's wasteful wall." 165 Cong. Rec. S1362 (daily ed. Feb 14, 2019).The President continued to be in conflict with Congress over border wall construction funding in negotiations over the fiscal year 2020 budget. On March 11, 2019, the White House Office of Management and Budget released the President's Fiscal Year 2020 Budget Request. The President stated that "finishing the border wall is an urgent national priority," and that "[m]y Budget continues to reflect these priorities." Accordingly, the fiscal year 2020 "Budget requests $5 billion to construct approximately 200 miles of border wall along the U.S. Southwest border."

26.     On March 12, 2019, the Department of Defense released its fiscal year 2020 budget proposal, which requested "$9.2 billion of emergency funding for unspecified military construction." Of that figure, $3.6 billion would be allocated "to build border barriers," and an additional $3.6 billion would be used to "backfill funding reallocated in FY 2019 to build border barriers."

27.     In spite of President Trump's multibillion-dollar wall budget requests, Congress again decided that only $1.375 billion should be spent on wall construction, allocating an identical amount for construction in fiscal year 2020 as it had for fiscal year 2019. Congress also imposed a prohibition on the use of any appropriated funds to "increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act . . . ." Pub. Law No. 116-93, Division C § 739.

28.     In considering the President's budget request for fiscal year 2020, Congress further denied the Department of Defense's requests to provide new wall money and to backfill the $3.6 billion that the administration previously diverted from military construction projects during fiscal year 2019. Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, who

was actively involved in negotiations on the 2020 Consolidated Appropriations Act, explained that "[a]s of November 22, the Department of Defense had only expended $2 million of the $3.6 billion the President stole, so he has the ability to return a significant portion of the funds appropriated back to the projects they originally supported."

29.     President Trump signed the 2020 Consolidated Appropriations Act into law on December 20, 2019.

**Defendants have acted to circumvent Congress's exclusive control over appropriations.**

30.     In January 2020, multiple newspapers reported that the executive branch intended to divert an additional $7.2 billion from the military to wall construction. *See, e.g.*, Maggie Haberman and Zolan Kanno-Youngs, N.Y. Times, Trump Plans to Divert Additional $7.2 Billion From Military to Wall (Jan. 14, 2020).

31.     On February 13, 2020, Secretary Esper announced that DoD would fund $3.831 billion in border wall construction using fiscal year 2020 funds. That same day, President Trump extended the previously-declared national emergency, which was set to expire on February 15, 2020. 85 Fed. Reg. 8715.

32.     The executive branch's efforts to divert military funds to the wall repeat the same actions it undertook in 2019. On February 15, 2019, President Trump declared a national emergency in order to secure funding for his border wall. The President's declaration came after a weeks-long stalemate between the President and Congress, during which the President repeatedly threatened to declare a national emergency if Congress did not fund the construction of the border wall to the extent and at the pace the President preferred. In announcing his declaration of national emergency last year, President Trump expressly disagreed with Congress's appropriation decision and called for billions more for border wall construction.

33.     Although he signed the appropriations legislation that Congress passed, President Trump stated that he was "not happy" with Congress's compromise deal and would find "other methods" to finance a wall without explicit approval form Congress. According to the President, $1.375 billion from Congress is "not so much" for a border wall and an emergency declaration

would allow him to supplement what Congress has authorized "[s]o we have a chance of getting close to $8 billion [and] . . . build a lot of wall."

34.     In announcing his declaration of national emergency, President Trump stated that he decided to declare an emergency because he was dissatisfied with the pace of Congress's spending. President Trump acknowledged that he "went through Congress . . . made a deal . . . got almost $1.4 billion" and was "successful, in that sense." But, he explained, "I want to do it faster. I could do the wall over a longer period of time. I didn't need to do this, but I'd rather do it much faster."

35.     While admitting that the appropriations bill provided him with a substantial amount of border wall funding, President Trump declared that he was still "not happy with it" because "on the wall, [Congress] skimped."

36.     Over the course of 2019, the executive branch acted to funnel $3.6 billion in military construction funds and $2.5 billion in other military funds to the border wall, in contravention of Congress's appropriations judgment.

**Construction of President Trump's Wall Will Have Devastating Effects on the Environment.**

37.     Border wall construction using military funds diverted by the Defendants is already destroying delicate lands along the border.

38.     For example, large sections of Organ Pipe Cactus National Monument, a previously protected landscape, have been and continue to be bulldozed and dynamited to make way for wall and road construction. In addition, wall construction is taking a toll on scarce water resources, as millions of gallons of water are slated to be drained from underground aquifers to mix cement for the wall's foundation.

39.     In addition to ongoing and imminent construction, the President's diversion of funds not appropriated by Congress to expand and expedite the border wall has injured SBCC and its member organizations. SBCC and its members have been compelled to respond to the declared emergency to safeguard their and their members' interests, including by diverting resources from the organizations' campaigns to unveil ongoing and imminent construction, educate their members, and respond to threats to their organizational missions. Staff and affiliates have participated in grassroots advocacy, engaged in rapid-response political outreach and advocacy with congressional

and local elected officials, and responded to requests from their members, the public, and elected officials about the threat and implementation of unlawful expedited construction. The circumvention of legal processes, lack of transparency, notice, and consultation, have frustrated the organizations' efforts to work towards their missions on behalf of their members.

40.     Defendants have not conducted a public review of these activities' impacts on the environment and local communities that complies with NEPA.

## LEGAL BACKGROUND

**The Constitution Vests Congress with Exclusive Authority to Determine the Appropriation of Public Funds.**

41.     The Constitution bans the expenditure of any public funds by any branch of the federal government, including the Executive Branch, absent enactment of a law appropriating such funds: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7. The Constitution thus vests Congress, and only Congress, with the power to spend public funds, and it must do so by passing identical appropriations bills in both the House and the Senate. Public funds may only be expended as specified in such duly enacted appropriations laws. Except as specifically authorized by Congress, the Executive Branch has no authority to expend public funds that have not been thus appropriated.

42.     The Appropriations Clause, in Article I, section 9, clause 7 of the Constitution, provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

43.     The Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

44.     Congress also may enact authorization legislation to establish, continue, or modify an agency, program, or government function. Congressional authorization of a program, however,

does not confer power on the Executive Branch to expend public funds. Only a specific appropriations law can do that.

45.     Although Congress may combine an authorization and an appropriation in a single bill, it may (and most often does) enact them separately. In keeping with its broad constitutional authority, Congress may choose not to appropriate funds for an authorized program, or Congress may appropriate a different amount of money than the amount (if any) provided for in an authorization. Congress also may limit the purposes for which appropriated funds may be used.

46.     Appropriations laws generally take one of two forms: (a) temporary appropriations, which typically are enacted on an annual basis, and (b) permanent appropriations, which are few in number and which (i) remain in effect until Congress repeals or modifies them, and (ii) permit federal agencies to expend public funds without the need for passage of a temporary appropriations bill in the current Congress. For an appropriation to be considered permanent, the law must clearly and expressly so provide.

47.     By providing funding to the Executive Branch through temporary (typically annual) appropriations, Congress ensures Executive Branch accountability by forcing the Executive Branch to return to Congress each year to seek continued funding for authorized agencies, programs, and government functions. This process provides Congress the opportunity to determine a suitable amount of funding after careful consideration.

48.     Temporary appropriations also reinforce and further Congress' constitutional responsibility to oversee the Executive Branch, and thereby act as a check upon the Executive Branch, as the Framers intended.

**The Constitution Does Not Allow Appropriations to Be Made by Executive Fiat, Rather than by Law.**

49.     "It is for Congress, proceeding under the Constitution, to say what amount may be drawn from the Treasury in pursuance of an appropriation." *Hooe v. United States*, 218 U.S. 322, 333 (1910). If the Executive Branch spends money in violation of an appropriation law, "it would be drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

50.     No statute can provide the President with authority to spend in excess of congressional limitations, or to draw money from the Treasury by executive declaration in a manner that contravenes the appropriations that have been made by law. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Office of Pers. Mgmt.*, 496 U.S. at 425.

51.     Nor can Congress endow the President with the power to reallocate money within the federal budget by executive emergency declaration. "The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow." *Clinton v. City of New York*, 524 U.S. at 452 (Kennedy, J., concurring).

**The Constitution's Presentment Clause Requires that the President Either Approve a Bill or Return it to Congress with Objections.**

52.     The Presentment Clause, Article I, Section 7, Clause 2, provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States: If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."

53.     The President has no constitutional authority to modify the appropriations bills passed by Congress. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. at 438. This restriction dates back to the founding: "Our first President understood the text of the Presentment Clause as requiring that he either approve all the parts of a Bill, or reject it in toto." *Id.* at 440 (quotation marks omitted).

54.     "Where the President does not approve a bill, the plan of the Constitution is to give to the Congress the opportunity to consider his objections and to pass the bill despite his disapproval." *Wright v. United States*, 302 U.S. 583, 596 (1938).

**Congress Has Strictly Restricted the Use of Appropriated Funds for Emergency Military Construction Authority Under 10 U.S.C. § 2808.**

55.    Congress imposed binding restrictions on the President's emergency powers to use military construction funds for non-appropriated projects. Specifically, Congress limited the use of emergency military construction funds only for projects (a) undertaken during a national emergency "that requires use of the armed forces," and (b) that "are necessary to support such use of the armed forces." 10 U.S.C. § 2808.

56.    For purposes of Section 2808, Congress defines the term "military construction" as including "any construction, development, conversion, or extension or any kind carried out with respect to a military installation . . . or any acquisition of land or construction of a defense access road." Congress defined "military installation" as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department . . . ." 10 U.S.C. § 2801(a).

57.    The emergency construction authority under 10 U.S.C. § 2808 has been used in the past only for military construction directly linked to a military installation connected to war efforts abroad and for protection of weapons of mass destruction.

**Congress Has Expressly Restricted the Use of Appropriated Funds for Military Construction of Border Fencing Under 10 U.S.C. § 284.**

58.    Congress imposed binding restrictions on the Secretary of Defense's authority to provide support for construction of border fences. Specifically, Congress authorized the use of Department of Defense support only for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," rather than across an entire international border. 10 U.S.C. § 284(b)(7).

59.    In addition, Congress blocked the Secretary of Defense from redetermining the funding balance struck by Congress by requiring that the Secretary of Defense seek reimbursement of support provided by the Department of Defense to other agencies. Accordingly, 10 U.S.C. § 277 provides that "to the extent otherwise required by section 1535 of title 31 (popularly known as the "Economy Act") or other applicable law, the Secretary of Defense shall require a civilian law enforcement agency to which support is provided under this chapter to reimburse the Department of Defense for that support."

**Congress Has Expressly Restricted the Secretary of Defense's Authority to Transfer or Reprogram Funds Under Sections 8005 and 9002 of the Department of Defense Appropriations Act, 2020, Sections 1001 and 1520A of the National Defense Authorization Act, 2020, and 10 U.S.C. § 2214.**

60.    Congress has restricted the Secretary of Defense's reprogramming and transfer powers to ensure that transfer authorities do not provide an end run around Congress's role in determining funding levels.

61.    Authority to transfer funds pursuant to Section 8005 of the Department of Defense Appropriations Act, 2020, "may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Authority to transfer funds pursuant to Section 9002 of the Department of Defense Appropriations Act, 2020 "is subject to the same terms and conditions as the authority provided in section 8005 of this Act."

62.    Authority to transfer funds pursuant to Section 1001 of the National Defense Appropriations Act, 2020, "may not be used to provide authority for an item that has been denied authorization by Congress." Authority to transfer funds pursuant to Section 1520A of the Act is "subject to the same terms and conditions as transfers under section 1001."

63.    Congress has likewise limited the transfer of non-construction Department of Defense funds in 10 U.S.C § 2214(b) to transfers that (1) "provide funds for a higher priority item, based on unforeseen military requirements, than the items for which the funds were originally appropriated;" and (2) are not for "an item for which Congress has denied funds."

**The National Environmental Policy Act Requires Agencies to Consider and Make Public the Environmental Impact of Their Actions.**

64.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978). It was enacted with the ambitious objectives of "encourag[ing] productive and enjoyable harmony between man and his environment . . . to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

65.     In order to achieve these goals, NEPA contains several "action forcing" procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

66.     The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies. See 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508 (1978).

67.     When a federal agency is not certain whether an EIS is required, it must prepare a briefer document, known as an environmental assessment ("EA"). 40 C.F.R. § 1508.9 (1978). If the agency concludes in an EA that an action may have significant impacts on the environment, then an EIS must be prepared. *Id.* § 1501.4. If an EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the action's impacts are insignificant and issue a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.13.

68.     The Supreme Court has found that the preparation and public circulation of EISs and EAs promotes NEPA's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349.

69.     NEPA requires that "agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2 (1978); id. § 1502.5 ("An agency shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal . . . ."). The Ninth Circuit has interpreted these regulations as requiring the NEPA process to be conducted "before any irreversible and irretrievable commitment of resources." *Connor v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1998).

70.     A "[p]roposal exists at that stage in the development of an action when an agency . . . has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23. Actions are defined to "include new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," and include "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area," as well as "actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id.* §§ 1508.18(a) & (b)(4).

71.     For activities covering multiple landscape types and jurisdictions, agencies may prepare a programmatic EIS ("PEIS"). A PEIS evaluates the effects of broad proposals or planning-level decisions that may include any or all of the following: a wide range of individual actions; implementation over a long timeframe; and/or implementation across a large geographic area.

72.     The Department of Homeland Security has not promulgated regulations to implement NEPA, but has issued an Instruction Manual. Instruction Manual 023-01-001-01, Revision 01, Implementation of NEPA (Nov. 6, 2014) ("DHS NEPA Manual"). The Manual specifically includes "proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas" as an action "normally requiring" the preparation of at least an EA.

73.     Echoing the general NEPA requirements regarding the need to conduct NEPA early in the process, the DHS NEPA Manual directs the Department of Homeland Security to "integrate[] the NEPA process with other planning efforts at the earliest possible stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made." DHS NEPA Manual, at p. IV-1. The Manual directs that agency components that process applications for Department of Homeland Security funding or approval, "have a responsibility to integrate NEPA requirements early in the application process," and to ensure that "completion of the NEPA process occurs before making a decision to approve" the proposal.

74.     NEPA requires that the Agencies involve the public in preparing and considering environmental documents that implement the Act. 40 C.F.R. § 1506.6; *id.* § 1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected").

75.     The CEQ regulations further direct federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made," and mandate that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

76.     In analyzing an action's environmental effects, an agency must also consider the effects of both: "connected actions," meaning those that are "[c]losely related," including actions that "[c]annot or will not proceed unless other actions are taken previously or simultaneously," and actions that are "interdependent parts of a larger action and depend on the larger action for their justification"; and "cumulative actions," meaning those that "when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25.

77.     The Ninth Circuit has held that a "complete failure to involve or even inform the public" about the agency's preparation of a NEPA document violates the statute's public participation requirements. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003).

78.     Underlying all of NEPA's procedural requirements is the mandate that agencies take a "hard look" at all of the environmental impacts and risks of a proposed action. As stated by the Ninth Circuit, "general statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal citations omitted).

**Fiscal Law Forbids Mixing and Matching Sources of Funding to Evade Spending Limits.**

79.     The Anti-Deficiency Act prohibits spending funds in excess of appropriations, unless authorized by statute. *See* 31 U.S.C. § 1341(a)(1)(A) (officers and employees may not "make

or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"). It also prohibits the executive branch from involving the United States government "in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." *Id*. § 1341(a)(1)(B).

80.     The Purpose Statute mandates that appropriated funds may be used only for the purpose of the appropriation, unless authorized by statute. *See* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

81.     The Transfer Statute prohibits transfer of funds from one account to another, unless authorized by statute. *See* 31 U.S.C. § 1532 ("An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."). "Transfers without statutory authority are equally forbidden whether they are (1) transfers from one agency to another, (2) transfers from one account to another within the same agency, or (3) transfers to an interagency or intra-agency working fund." GAO, *Principles of Federal Appropriations Law: Fourth Edition*, Chapter 2, GAO-16-464SP, pp. 2-38–2-39. In addition to violating the Transfer Statute, "an unauthorized transfer would violate 31 U.S.C. § 1301(a) (which prohibits the use of appropriations for other than their intended purpose), would constitute an unauthorized augmentation of the receiving appropriation, and could, if the transfer led to overobligating the receiving appropriation, result in an Antideficiency Act (31 U.S.C. § 1341) violation as well." *Id*. at 2-38.

82.     Fiscal law protects a key function of congressional appropriations judgment: setting a maximum authorized program level by specifically appropriating a finite set of funds for a particular project. *See* SBA's Imposition of Oversight Review Fees on PLP Lenders, B-300248 (Comp. Gen. Jan. 15, 2004) ("In addition to providing necessary funds, a congressional appropriation establishes a maximum authorized program level, meaning that an agency cannot, absent statutory authorization, operate beyond the level that can be paid for by its appropriations."). "Allowing an agency to exceed this level with funds derived from some other source would usurp congressional prerogative and undercut the congressional power of the purse." Availability of

Receipts from Synthetic Fuels Projects for Contract Admin. Expenses of the Dep't of Treasury, Office of Synthetic Fuels Projects, B-247644, 72 Comp. Gen. 164, 165 (Apr. 9, 1993).

83.     According to longstanding interpretations of fiscal law, an agency may not combine multiple appropriations to complete a project when neither appropriation is sufficient on its own for the project. *See* Department of Homeland Security—Use of Management Directorate Appropriations to Pay Costs of Component Agencies, B-307382 (Comp. Gen. Sept. 5, 2006). An agency cannot "elect to use (or exhaust) first one and then the other of the two appropriations for the same class of expenditures." *Id.* (citing 10 Comp. Gen. 440, 447 (1931)).

84.     In addition, "specific appropriations preclude the use of general ones even when the two appropriations come from different accounts." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (citing 4 Comp. Gen. 476 (1924)). In other words, where Congress has allocated a specific amount of funding for an activity, an agency cannot use funding from a more general fund to accomplish the specific goal.

85.     Finally, under the so-called "pick and stick rule," when two appropriations are available for the same purpose, the agency must select which to use—and once it has made an election, the agency may not make use of funds from a different appropriation for the same purpose, unless the agency, at the beginning of the fiscal year, informs Congress of its intent to change for the next fiscal year. *See* Department of Homeland Security—Use of Management Directorate Appropriations to Pay Costs of Component Agencies, B-307382; *see also* 68 Comp. Gen. 337 (1989); 59 Comp. Gen. 518 (1980).

### DECLARATORY AND INJUNCTIVE RELIEF

86.     Plaintiffs will suffer irreparable injury if Defendants take action to build a wall in reliance on the Proclamation, or in implementing the President's direction to use funds pursuant to 10 U.S.C. §§ 284 and 2808, and Plaintiffs have no adequate remedy at law.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (The Consolidated Appropriations Act of 2020, Pub. Law No. 116-93)

87. Neither the President nor any other federal official can take an action that exceeds the scope of their constitutional and/or statutory authority.

88. Congress has explicitly limited Defendants' authority to construct a border wall through exercise of its constitutional appropriations power in the Consolidated Appropriations Act of 2020. Congress's appropriations judgment is that only $1.375 billion should be used to construct a border wall.

89. Congress enacted the Consolidated Appropriations Act of 2020 against the backdrop of the President's continued demand for billions in unrestricted border wall funding for construction of a contiguous barrier between the United States and Mexico. "Congress has expressed its will to withhold this power from the President as though it had said so in so many words." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 602 (1952) (Frankfurter, J., concurring).

90. The President has nonetheless instructed the Secretaries of Homeland Security and Defense to act beyond the limitations imposed by Congress, in purported reliance on a patchwork of older, more general statutes that are silent on wall construction.

91. The statutes the President purports to rely on, 10 U.S.C. §§ 284 and 2808, do not authorize wall construction outside of the limited geographic, monetary, and scheduling bounds set by Congress in the Consolidated Appropriations Act of 2020.

92. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* at 143. Therefore, "a specific policy embodied in a later . . . statute should control [judicial] construction of the [earlier broad] statute, even though it ha[s] not been expressly amended." *Id.* (quotations and citations omitted; brackets in original).

93. Use of funds under 10 U.S.C. § 2808 in accordance with the President's

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Proclamation to construct the border wall violates the Consolidated Appropriations Act of 2020. It funds the wall in excess of the amount established by Congress and it denies funds from other projects that Congress chose to fund.

94.     The President's Proclamation does not meet the conditions required for invocation of 10 U.S.C. § 2808 because it does not identify an emergency requiring use of the armed forces.

95.     The President's Proclamation additionally does not meet the conditions required for invocation of 10 U.S.C. § 2808 because construction of a border wall is not a military construction project supporting the armed forces.

96.     Use of funds under 10 U.S.C. § 284 to construct the border wall violates the Consolidated Appropriations Act of 2020.

97.     The Department of Defense's use of funds under 10 U.S.C. § 284 to construct a contiguous fence across the international boundaries of the United States is contrary to Congress's requirement that construction under that statute must be limited to drug smuggling corridors.

98.     Congress did not delegate to the Secretary of Defense the decision to construct a contiguous fence across the southern border through a bill providing for military support of law enforcement activities. Interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude . . . ." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.

99.     In addition, the use of funds in excess of the $1.375 billion authorized in the Consolidated Appropriations Act of 2020 for construction of a border barrier violates Division C, Section 739 of the Act because it would represent an "increase [in] . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year" before "such proposed change is subsequently enacted in an appropriation Act."

100.    The President has proposed an increase of funding by several billion dollars in his budget request for fiscal year 2020, and such proposed change has not been enacted in an appropriation act.

101.    The only exception to the Section 739 prohibition on increases in funding is for increases "made pursuant to the reprogramming or transfer provisions of this or any other

appropriations Act." Neither 10 U.S.C. § 2808 nor 10 U.S.C. § 284 is an appropriations act, so the use of either authority to increase funding for the President's wall construction is prohibited.

102.    Defendants are acting ultra vires in using funds to construct the border wall beyond the restrictions Congress imposed in the Consolidated Appropriations Act of 2019.

### SECOND CLAIM FOR RELIEF
**(Separation of Powers, Article I, Section 9, Clause 7 of the Constitution)**

103.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

104.    Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

105.    Congress has explicitly limited Defendants' authority to construct a border wall through exercise of its constitutional appropriations power in the Consolidated Appropriations Act of 2019.

106.    The President has nonetheless instructed the Secretaries of Defense and Homeland Security to act beyond the limitations imposed by Congress by spending approximately $8.1 billion to build a wall across the border.

107.    "It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem . . . to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress." *Youngstown*, 343 U.S. at 609 (Frankfurter, J., concurring).

108.    Because the statutes the President purports to rely on, 10 U.S.C. §§ 284 and 2808, do not authorize wall construction outside of the limited geographic, monetary, and scheduling bounds set by Congress in the Consolidated Appropriations Act of 2020, the use of those statutes to fund border wall construction usurps Congress's legislative authority and violates the Constitution's separation of powers.

### THIRD CLAIM FOR RELIEF
#### (Appropriations Clause, Article I, Section 9, Clause 7 of the Constitution)

109. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

110. The Constitution only permits money to be withdrawn from the Treasury by an appropriation made by law. U.S. Const. art. I, § 9, cl. 7.

111. In the Consolidated Appropriations Act of 2019, Congress has appropriated only $1.375 billion for border wall construction.

112. The President asserts that he has independent authority under 10 U.S.C. §§ 284 and 2808 to order that billions more be spent on the wall than provided in those legislative appropriations. The President has ordered the Secretaries of Defense and Homeland Security to implement his determination that additional billions be spent on construction of the border wall.

113. Congress cannot give the President the authority to make an appropriation, including by statutes that provide authority for emergency proclamations.

114. To the extent that 10 U.S.C. §§ 284 and 2808 authorize the President to allocate money from the Department of the Treasury by executive proclamation, rather than by law, and in contravention of restrictions contained in Congress's appropriations' laws, they violate the Constitution.

### FOURTH CLAIM FOR RELIEF
#### (Presentment Clause, Article I, Section 7, Clause 2)

115. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116. The Presentment Clause requires that when Congress passes an appropriations bill, the President has only two options: he must sign it, or return it with his objections so that Congress may consider them.

117. Instead of following this mandatory requirement, the President signed a bill to which he objected, and announced that he would use the National Emergencies Act to reallocate funds to his liking.

118. Because the President has purported to modify or repeal the appropriations bill passed by Congress, including by improperly relying on an emergency proclamation to lift

restrictions Congress imposed on border wall funding in the appropriations bill, his actions violate the Presentment Clause.

119.    To the extent that 10 U.S.C. §§ 284 and 2808 authorize the President to modify or repeal Congress's appropriations legislation by executive proclamation, rather than by law, they violate the Constitution.

## FIFTH CLAIM FOR RELIEF
### (National Environmental Policy Act, 42 U.S.C. § 4332)

120.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

121.    The Secretaries of Defense and Homeland Security must ensure that their agencies prepare an environmental impact statement on major Federal actions "significantly affecting the quality of the human environment," and prepare an environmental assessment to determine whether any such significant effects exist. *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989); *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); 42 U.S.C. § 4332(2)(C). A federal agency "bears the primary responsibility to ensure that it complies with NEPA." *'Ilio'Ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006). "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

122.    NEPA requires that the Defendants involve the public in preparing and considering environmental documents that implement the Act. 40 C.F.R. § 1506.6 (1978); id. § 1506.6(b)(1) (requiring federal agencies to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected").

123.    Border wall construction is a final agency action, for purposes of the Defendants' obligations under NEPA.

124.    To the extent that the Department of Homeland Security can waive aspects of its own compliance with NEPA, that authority is absent with respect to the Department of Defense's use of funds.

125.    As directed by Defendant Trump's Proclamation, Defendants Esper and Wolf violate NEPA and NEPA's implementing regulations by authorizing border wall construction without first conducting the necessary environmental analysis of the impacts of the actions in an EA or EIS, or a programmatic EIS, in light of the potentially significant impacts that the action will have, including both cumulative effects and the effects of connected actions.

126.    As directed by Defendant Trump's Proclamation, Defendants Esper and Wolf further violate NEPA and NEPA's implementing regulations by failing to initiate and complete NEPA at the earliest possible time in the planning process.

127.    As directed by Defendant Trump's Proclamation, Defendants Esper and Wolf have utterly failed and/or refused to involve the public in its decision-making processes for border construction. This failure to provide for any public participation in relation to their approval of border wall construction violates NEPA and its implementing regulations.

### SIXTH CLAIM FOR RELIEF
**(Ultra Vires)**

128.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

129.    Defendants are acting ultra vires in seeking to divert funding or resources pursuant to 50 U.S.C. § 1631 and 10 U.S.C. § 2808 for failure to meet the criteria required under those statutes. There is no emergency requiring the use of the armed forces along the U.S.-Mexico border, construction of a border wall is not a "military construction project," and construction of a border wall is not "necessary to support such use of the armed forces."

130.    Defendants are acting ultra vires in seeking to divert funding or resources pursuant to 10 U.S.C. § 284 for failure to meet the criteria required under that statute. Construction of the border wall does not constitute the construction of a road or fence to block "drug smuggling corridors." In addition, use of funds under 10 U.S.C. § 284 to construct the border wall in the face of Congress's judgment that additional money should not be spent on the wall would violate the Consolidated Appropriations Act of 2020 because such money, having not been appropriated for wall construction, cannot be reimbursed to the Department of Defense under 10 U.S.C. § 277.

131.     Defendants are also acting ultra vires in seeking to divert funding or resources pursuant to 10 U.S.C. § 284 by violating the restrictions in appropriations law, including the requirements of the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1), the Purpose Statute, 31 U.S.C. § 1301(a), and the Transfer Statute, 31 U.S.C. § 1532, as correctly interpreted by the GAO.  An agency cannot "elect to use (or exhaust) first one and then the other of the two appropriations for the same class of expenditures." 10 Comp. Gen. 440, 447 (1931). Yet according to a White House fact sheet issued on February 15, Defendants intend to use different appropriations "sequentially and as needed." In addition, "specific appropriations preclude the use of general ones even when the two appropriations come from different accounts." *Nevada*, 400 F.3d at 16 (citing 4 Comp. Gen. 476 (1924)). But Defendants have indicated that they will disregard the specific limitation Congress imposed by allocating only $1.375 billion in funding for border barriers, and use additional, more general appropriations to fund further border wall construction. Finally, Defendants are violating the "pick and stick rule," because the government previously relied on different appropriations than the Drug Interdiction and Counter-Narcotics Activities account to fund border barrier construction, and the fiscal year 2019 budget justification for this appropriation includes no mention of any plans to use the appropriation for walls or fences.

132.     Defendants are acting ultra vires in seeking to transfer funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of building a permanent border wall. Sections 8005 and 9002 of the 2020 Department of Defense Appropriations Act, prohibit the transfer of Department of Defense funds "where the item for which funds are requested has been denied by the Congress," Sections 1001 and 1520A of the National Defense Authorization Act, 2020, bar transfers for "an item that has been denied authorization by Congress," and 10 U.S.C § 2214(b) similarly bars transfers in support of any "item for which Congress has denied funds." Congress has denied funding for Defendants' planned wall construction, thus barring the Department of Defense from using transfers to fund it.

133.     In addition, Defendants are acting ultra vires in seeking to transfer funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of building a permanent border wall because Sections 8005 and 9002 of the 2020 Department of Defense Appropriations

Act and 10 U.S.C § 2214(b) prohibit the transfer of Department of Defense funds except where the transfer is to support an item that is "based on unforeseen military requirements." The diversion of funding to build a border wall or fence is not based on unforeseen military requirements, because it is based on claims that Defendant Trump has made for years, including prior to enactment of the 2020 Department of Defense Appropriations Act. Moreover, the building of a permanent border wall is not a "military requirement." Instead, it is a Department of Homeland Security project. The Department of Defense is the lead agency only for "detection and monitoring of aerial and maritime transit of illegal drugs into the United States," 10 U.S.C. § 124, with no mention of military responsibilities for securing U.S. land borders.

134.    Defendants are acting ultra vires in seeking to transfer funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of building a permanent border wall because Sections 8005 and 9002 of the 2020 Department of Defense Appropriations Act and 10 U.S.C § 2214(b) do not authorize the transfer of Department of Defense funds for the purpose of supporting another agency's work. While 10 U.S.C. § 284 funds may, in appropriate circumstances, be used by the Department of Defense to support another agency's counterdrug efforts, Congress has not authorized the Department of Defense to transfer additional Defense funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of supporting another agency, rather than for military requirements.

## SEVENTH CLAIM FOR RELIEF
### (Violation of Administrative Procedures Act)

135.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

136.    The Administrative Procedures Act bars agency actions that are "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

137.    Defendants' decisions to transfer military funds to wall construction constitute agency actions under the Administrative Procedures Act.

138.    For the reasons stated above, Defendants' actions are contrary to the Constitution and in excess of statutory authority.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare the President's direction that Defendants Esper and Wolf reallocate funds to support construction of a border wall under 10 U.S.C. §§ 2808 and 284, Sections 8005 and 9002 of the 2020 Department of Defense Appropriations Act, and Sections 1001 and 1520A of the 2020 National Defense Authorization Act to be ultra vires, in excess of presidential authority under Article II of the Constitution, an infringement on legislative authority, a violation of the Presentment Clause, in violation of the Administrative Procedures Act, and invalid;

(B)    Enjoin Defendants Esper and Wolf from taking action to build a border wall using funds or resources from the Defense Department, or on any basis that depends on the President's unlawful emergency declaration;

(C)    Declare that Defendants Esper and Wolf have violated NEPA and its implementing regulations with respect to the border wall project by, inter alia, failing to conduct any NEPA analysis, failing to provide any opportunity for public participation, and failing to take a "hard look" at the potential environmental impacts of the border wall project;

(D)    Enjoin Defendants Esper and Wolf from implementing the border wall project until and unless Defendants comply with NEPA, the Endangered Species Act, and the implementing regulations for those laws;

(E)    Award Plaintiffs their reasonable costs of litigation; and

(F)    Grant such other and further relief as the Court may deem just and proper.

Dated: February 28, 2020

Mollie M. Lee (SBN 251404)
American Civil Liberties Union Foundation
   of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493
Fax: (415) 255-8437
mlee@aclunc.org

David Donatti*
Andre I. Segura (SBN 247681)
American Civil Liberties Union Foundation
   of Texas
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 325-7011
Fax: (713) 942-8966
ddonatti@aclutx.org
asegura@aclutx.org

Respectfully submitted,

/s/ Cecillia D. Wang

Cecillia D. Wang (SBN 187782)
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

Dror Ladin*
Noor Zafar*
Jonathan Hafetz*
Hina Shamsi*
Omar C. Jadwat*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2660
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

Sanjay Narayan (SBN 183227)**
Gloria D. Smith (SBN 200824)**
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
Tel.: (415) 977-5772
sanjay.narayan@sierraclub.org
gloria.smith@sierraclub.org

Counsel for Plaintiffs

   * *Application for admission* pro hac vice
*forthcoming*
**\*\*Counsel for Plaintiff* Sierra Club

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF