DROR LADIN*
NOOR ZAFAR*
JONATHAN HAFETZ**
HINA SHAMSI**
OMAR C. JADWAT**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Fax: (212) 549-2564
dladin@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
hshamsi@aclu.org
ojadwat@aclu.org

* *Admitted* pro hac vice
***Application for admission* pro hac vice *forthcoming*

CECILLIA D. WANG (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 343-0770
Fax: (415) 395-0950
cwang@aclu.org

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO-OAKLAND DIVISION**

| | |
|---|---|
| SIERRA CLUB and SOUTHERN BORDER COMMUNITIES COALITION,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; MARK T. ESPER, Secretary of Defense, in his official capacity; and CHAD F. WOLF, Acting Secretary of Homeland Security, in his official capacity,<br><br>*Defendants*. | Case No.: 4:20-cv-01494-HSG<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SECTION 284 PROJECTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Trial Date: None Set<br>Action Filed: February 28, 2020 |

1  Additional counsel for Plaintiffs:

2  SANJAY NARAYAN (SBN 183227)***
   GLORIA D. SMITH (SBN 200824)***
3  SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
   2101 Webster Street, Suite 1300
4  Oakland, CA 94612
   Tel.: (415) 977-5772
5  sanjay.narayan@sierraclub.org
   gloria.smith@sierraclub.org
6
   MOLLIE M. LEE (SBN 251404)
7  AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION OF NORTHERN CALIFORNIA, INC.
8  39 Drumm Street
   San Francisco, CA 94111
9  Tel.: (415) 621-2493
   Fax: (415) 255-8437
10 mlee@aclunc.org

11 DAVID DONATTI**
   ANDRE I. SEGURA (SBN 247681)
12 AMERICAN CIVIL LIBERTIES UNION FOUNDATION
     OF TEXAS
13 P.O. Box 8306
   Houston, TX 77288
14 Tel.: (713) 325-7011
   Fax: (713) 942-8966
15 ddonatti@aclutx.org
   asegura@aclutx.org
16
   **Application for admission* pro hac vice *forthcoming*
17 ****Counsel for Plaintiff* Sierra Club

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ..................1

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................2

    INTRODUCTION ..............................................................................................................2

    FACTUAL BACKGROUND .............................................................................................2

    PROCEDURAL HISTORY ...............................................................................................5

    LEGAL STANDARD ........................................................................................................6

    ARGUMENT .....................................................................................................................7

        I.   Defendants' FY2020 Wall-Funding Scheme Is Unlawful ...........................................7

            a.   For the same reasons this Court already found with respect to Defendants'
                FY2019 scheme, Defendants may not use transfer authorities to fund a
                massive border wall that Congress considered and rejected ....................................7

            b.   Defendants' wall-funding scheme is not authorized by Section 284 ......................9

        II.  The Court Should Enjoin Defendants' Funnel-and-Spend Scheme ...........................13

    CONCLUSION.................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

### Cases

*California v. Tump*,
   407 F. Supp. 3d 869 (N.D. Cal. 2019) ........................................................................... 5, 13

*City & Cty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ....................................................................................... 11

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ......................................................................................... 6

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ......................................................................................................... 6

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ........................................................................................... 11, 12, 13

*Feldman v. Bomar*,
   518 F.3d 637 (9th Cir. 2008) ........................................................................................... 6

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) .................................................................................................... 9, 10

*Sierra Club v. Trump*,
   379 F. Supp. 3d 883 (N.D. Cal. 2019) ..................................................................... passim

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ............................................................................. 5, 8, 9, 13

*Sierra Club v. Trump*,
   No. 4:19-cv-00892-HSG (N.D. Cal. 2019) ...................................................................... 5

*Trump v. Sierra Club*,
   140 S. Ct. 1 (2019) ........................................................................................................... 5

*United States v. McIntosh*,
   833 F.3d 1163 (9th Cir. 2016) ......................................................................................... 8

*Util. Air Regulatory Grp. v. E.P.A.*,
   573 U.S. 302 (2014) .................................................................................................. 11, 12

*Whitman v. Am. Trucking Ass'ns.*,
   531 U.S. 457 (2001) ....................................................................................................... 12

### Statutes

10 U.S.C § 221 .......................................................................................................................... 8

10 U.S.C. § 284 ................................................................................................................. passim

2020 Department of Defense Appropriations Act, Pub. Law No. 116-92 (2019) ................ 7, 8

Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2020) ........4, 12, 13

Consolidated Appropriations Act of 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019) .........................3

National Environmental Policy Act, 42 U.S.C. § 4332 ...............................................................1, 13

**Rules**

Fed. R. Civ. P. 54 ...................................................................................................................................6

Fed. R. Civ. P. 56 ...................................................................................................................................6

**Other Authorities**

H.R. Rep. No. 109-452 (2006) ............................................................................................................12

H.R. Rep. No. 110-652 (2008) ............................................................................................................12

### NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that Plaintiffs Sierra Club and Southern Border Communities Coalition hereby move the Court pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment against Defendants Donald J. Trump, President of the United States of America; Mark T. Esper, in his official capacity as Secretary of Defense; and Chad F. Wolf, in his official capacity as Acting Secretary of Homeland Security (collectively, "Defendants").

Plaintiffs respectfully move the Court to direct entry of judgment in their favor (1) declaring unlawful Defendants' transfer of Fiscal Year 2020 appropriated funds to the Department of Defense's Section 284 account, the use of those funds for construction of a border wall, and Defendants' failure to comply with the National Emergency Policy Act ("NEPA") for this construction; (2) issuing a permanent injunction prohibiting Defendants and all persons associated with them from transferring Fiscal Year 2020 appropriated funds to the Section 284 account, using those funds to build a border wall, and proceeding with construction prior to complying with NEPA; and (3) specifically enjoining the use of 284 funds to construct the wall segments in the areas Defendants have identified as El Centro A, Tucson A, Tucson B, Tucson C, El Paso A, El Paso B, El Paso C, El Paso D, San Diego A, Yuma A, Yuma B, Del Rio A, and Del Rio B. This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities; the declarations and request for judicial notice, and the exhibits thereto; the incorporation by reference of written material and argument submitted in conjunction with the related litigation in *Sierra Club, et al. v. Donald Trump, et al.*, No. 4:19-cv-00892-HSG, and the appeals therefrom, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **INTRODUCTION**

This Court and others have ruled that Defendants have no authority to spend funds that Congress appropriated for the military to carry out a campaign promise to build a wall along the U.S.-Mexico border. Rather than abide by these decisions, Defendant Trump is now diverting billions of dollars in additional military funds to border wall construction in a rush to wall off as much of the border as possible before the presidential election.

Although Defendant Trump has demanded that Congress appropriate billions of dollars to fund his wall project, Congress has consistently rejected his demands. For each of the last two fiscal years, Congress has decided that only $1.375 billion should be spent on any border barrier construction. Defendants nonetheless diverted billions of dollars from the Department of Defense last year, and now seek to double down on their unlawful conduct, stripping the military of an additional $3.831 billion so that Defendants may aggrandize a wall that Congress refused to fund to their liking. Defendants' theory is that a combination of 10 U.S.C. § 284 ("Section 284") and various transfer authorities grants the Secretary of Defense unlimited discretion to spend up to six billion dollars on border wall construction every year, regardless of Congress's funding decisions. But Defendants' efforts to spend enormous sums that Congress denied them are contrary to the Constitution's careful design, Congress's explicit restrictions on the use of transfer authorities, and any plausible reading of Section 284. This Court should once again enforce Congress's limits and require Defendants to abide by the Constitution's separation of powers.

### **FACTUAL BACKGROUND**

As this Court has recounted, "[u]pon taking office in 2017, the President's administration repeatedly sought appropriations from Congress for border barrier construction." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 892 (N.D. Cal. 2019). "In December 2018—as Congress and the President were negotiating an appropriations bill to fund various federal departments for what remained of the fiscal year—the President announced that he would not sign any funding legislation that lacked substantial funds for border barrier construction. Congress did not pass a bill with the President's desired border barrier funding and, due to this impasse, the United States entered into

the nation's longest partial government shutdown." *Id.* "After the government shutdown ended, the President and others in his administration reaffirmed their intent to fund a border barrier, with or without Congress's blessing." *Id.* at 893.

Rather than secure Congress's approval, Defendants decided to circumvent Congress's authority. To do so, Defendants hatched a plan to cobble together billions of dollars that Congress appropriated for other purposes, primarily for military use, and funnel those funds to construct the wall in spite of Congress's decision.

On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019), which authorized "less than one quarter of the $5.7 billion sought by the President" for wall construction and imposed numerous limitations. *Sierra Club*, 379 F. Supp. 3d at 893–94. The next day, Defendant Trump both enacted Congress's limited funding decision and announced his plan to disregard it, including by funneling "[u]p to $ 2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities' (10 U.S.C. § 284) ('Section 284')." *Id.* at 895 (quoting White House "fact sheet").

Defendant Trump continued to request that Congress provide multibillion-dollar funding for a border wall in the fiscal year 2020 ("FY2020") budget. On March 11, 2019, the White House Office of Management and Budget released the President's Fiscal Year 2020 Budget Request. The President stated that "finishing the border wall is an urgent national priority," and that "[m]y Budget continues to reflect these priorities." Request for Judicial Notice ("RJN") ¶ 1, Ex. 1 at 2. Accordingly, the FY2020 "Budget requests $5 billion to construct approximately 200 miles of border wall along the U.S. Southwest border." RJN ¶ 1, Ex. 1 at 50.

On March 12, 2019, the Department of Defense released its FY2020 budget proposal, which requested "$9.2 billion of emergency funding for unspecified military construction." RJN ¶ 2, Ex. 2 at 6-9. That figure included "up to $3.6 billion to backfill any MILCON projects that we end up having to fund in '20 instead of '19" due to the previous year's military construction diversion for the border wall, and an additional "$3.6 billion for potential new construction for the border." RJN ¶ 3, Ex. 3 at 8. As the DoD's comptroller explained, "the reason we've done this is to reflect the

fact that we have a presidential priority that has a macro funding level and we want to help get to that funding level." RJN ¶ 3, Ex. 3 at 8.

Congress disagreed. Rejecting Defendant Trump's multibillion-dollar wall budget requests, Congress again decided that only $1.375 billion should be spent on wall construction, allocating an identical amount for construction in FY2020 as it had for fiscal year 2019 ("FY2019"). *See* Consolidated Appropriations Act ("CAA"), Pub. L. No. 116-93, § 209, 133 Stat. 2317, 2511–12 (2020). Congress also re-imposed a prohibition on the use of any appropriated funds to "increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act . . . ." CAA, Division C § 739.

Congress not only denied Defendants the new wall funding they sought, it also denied the Department of Defense's requests to backfill the $3.6 billion that the administration previously diverted from military construction projects during FY2019. Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, who was actively involved in negotiations on the 2020 Consolidated Appropriations Act, explained that "[a]s of November 22, the Department of Defense had only expended $2 million of the $3.6 billion the President stole, so he has the ability to return a significant portion of the funds appropriated back to the projects they originally supported." RJN ¶ 4, Ex. 4 at 1. President Trump signed the 2020 CAA into law on December 20, 2019.

 A few weeks later, on January 14, 2020, Defendants replicated the FY2019 conduct that this Court and the Ninth Circuit had found to be illegal. First, after Congress denied Defendants' request for hundreds of miles in wall construction, DHS initiated a request to DoD for wall construction across "approximately 271 miles." Administrative Record ("Admin. R."), ECF No. 18-1 at 42. On February 13, 2020, Defendant Esper announced that DoD would transfer and spend $3.831 billion in funds Congress had appropriated for other purposes on border wall construction. Admin. R., ECF No. 18-1 at 13. The funds are intended to construct "approximately 177 miles of 30-foot bollard fencing in FY 2020." Admin. R., ECF No. 18-1 at 5.

According to Defendant Esper, "[t]he need to provide support for the above projects was an unforeseen military requirement not known at the time of the fiscal year 2020 budget request,"

because, although both DHS and DoD had requested billions for wall construction, "DHS had not previously requested support for these specific projects" from DoD funds. Admin. R., ECF No. 18-1 at 14. Defendant Esper also found that even though DoD had requested (and been denied) billions of dollars in wall funding, the wall construction "has not been denied by Congress" because Congress had not specifically enacted a new prohibition against the denied spending request. Admin. R., ECF No. 18-1 at 14.

**PROCEDURAL HISTORY**

Plaintiffs challenged Defendants' FY2019 diversions in a related case, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG (N.D. Cal.), on February 19, 2019. Plaintiffs sought injunctions against specific wall segments as Defendants made public their construction decisions. On May 24, 2019, this Court entered a preliminary injunction barring Defendants' initial transfer of $1 billion to construct wall sections in Arizona and New Mexico. *See Sierra Club*, 379 F. Supp. 3d at 916. On June 28, 2019, this Court issued a permanent injunction incorporating its prior reasoning on the merits, and extending it to the full $2.5 billion in wall construction that Defendants announced under claimed Section 284 authority. *See* Order Granting in Part & Denying in Part Plaintiffs' Motion for Partial Summary Judgment, Denying Defendants' Motion for Partial Summary Judgment, Certifying Judgment for Appeal, & Denying Request to Stay, No. 4:19-cv-00892-HSG (N.D. Cal. June 28, 2019), ECF No. 185.

Defendants sought an emergency stay of this Court's injunction from the Ninth Circuit. On July 3, 2019, a Ninth Circuit panel denied the stay motion in a published 2-1 opinion. *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019). On July 26, 2019, a majority of the Supreme Court issued a one-paragraph order staying the permanent injunction. *Trump v. Sierra Club*, 140 S. Ct. 1 (2019). The appeal remains pending.

Plaintiffs sought an injunction against Defendants' use of military construction funds under claimed national emergency authority on October 11, 2019, just over a month after Defendants announced the additional projects. This Court granted Plaintiffs a permanent injunction on December 11, 2019. *California v. Trump*, 407 F. Supp. 3d 869 (N.D. Cal. 2019), but stayed its

injunction pending appeal. Defendants' appeal of that injunction is pending before the court of appeals after argument was held on March 10, 2020.

Plaintiffs filed the Complaint in this case on February 28, 2020, challenging Defendants' diversion of FY2020 funds. Plaintiffs now seek partial summary judgment with respect to Defendants' Section 284 projects. In accordance with this Court's March 6, 2020 Order, ECF No. 15 ¶ 5, Plaintiffs' claims with respect to any projects taken under claims of authority under 10 U.S.C. § 2808 to divert FY2020 military construction funds are held in abeyance until such projects are announced.

### LEGAL STANDARD

The Federal Rules of Civil Procedure provide for entry of partial summary judgment. "[T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). A party may move for summary judgment on any "claim or defense" or "part of [a] claim or defense," Fed. R. Civ. P. 56(a), and a district court should enter summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*.

A party seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

A "case or controversy exists justifying declaratory relief" exists if "the challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008) (quotation omitted).

**ARGUMENT**

The Court should once again bar Defendants' attempts to usurp Congress's constitutional role.[1]

## I.   Defendants' FY2020 Wall-Funding Scheme Is Unlawful.

In spite of this Court's determination that Defendants' "massive funnel-and-spend project" using $2.5 billion in FY2019 funding was unlawful, *Sierra Club*, 379 F. Supp. 3d at 917, Defendants now seek to aggrandize their scheme with an even larger diversion of more than $3.8 billion in FY2020 funding. Defendants' scheme is thus *ultra vires* for the same reasons as this Court already found with respect to Defendants' diversion of FY2019 funds. In fact, the illegality of Defendants' transfers is even more pronounced this time around: in defending their actions in FY2019, Defendants asserted that DoD had not requested wall funding from Congress and therefore (a) Congress could not have denied the funding and (b) the border wall was an "unforeseen military requirement;" they cannot raise the same arguments here. In addition to Defendants' lack of transfer authority, their scheme is unlawful because Section 284 itself provides no authority for the Secretary of Defense to construct a multibillion-dollar wall for DHS at his sole discretion and in disregard of Congress's funding decisions.

### a.   For the same reasons this Court already found with respect to Defendants' FY2019 scheme, Defendants may not use transfer authorities to fund a massive border wall that Congress considered and rejected.

The transfer authorities invoked by Defendants are all subject to the limitations that they may not be used to fund items that have been denied by Congress and must be based on unforeseen military requirements.[2] Defendants' multibillion-dollar border wall violates both requirements for

---

[1] In accordance with this Court's March 6, 2020 Order, ECF No. 15 ¶ 3, Plaintiffs incorporate by reference the arguments made in their previous briefing in the FY2019 wall-funding case, *Sierra Club v. Trump*.

[2] Authority to transfer funds pursuant to Section 8005 of the Department of Defense Appropriations Act, 2020, "may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Authority to transfer funds pursuant to Section 9002 of the Department of Defense Appropriations Act, 2020 "is subject to the same terms and conditions as the authority provided in section 8005 of this Act." Authority to transfer funds pursuant to Section 1001 of the Department of Defense Appropriations Act, 2020, "may not be used to provide authority for an item that has been denied authorization by Congress."

using these authorities.

Congress denied the border wall funding at issue here. Defendants requested $5 billion for border wall construction in the DHS budget, and an additional $7.2 billion for border wall construction in DoD's budget. Congress, as it did in the 2019 CAA, authorized only $1.375 billion in total border wall spending. As this Court already found with respect to the FY2019 funds, when Defendants request billions of dollars for border wall construction and Congress appropriates a far lower amount, "Congress denied the requested funds for that item." *Sierra Club*, 379 F. Supp. 3d 883 at 913. "It thus would be inconsistent with the purpose of these [transfer] provisions, and would subvert 'the difficult judgments reached by Congress,' to allow Defendants to circumvent Congress's clear decision to deny the border barrier funding sought here when it appropriated a dramatically lower amount in the CAA." *Id.* (quoting *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016)); *accord Sierra Club*, 929 F.3d at 692 ("In sum, Congress considered the 'item' at issue here—a physical barrier along the entire southern border, including in the Yuma, El Paso, Tucson, and El Centro sectors—and decided in a transparent process subject to great public scrutiny to appropriate less than the total amount the President had sought for that item. To call that anything but a 'denial' is not credible."). And Defendants' position here is even weaker than it was last year: while Defendants previously argued that Congress had not denied wall funding to DoD because a "different agency" (DHS) had requested wall funding, *see, e.g.*, Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, No. 4:19-cv-00892-HSG (N.D. Cal. Apr. 25, 2019), ECF No. 64 at 16, here DoD itself explicitly requested border wall funding and was denied.

Nor could the border wall be "unforeseen." As this Court has already explained, a claim that "the requested border barrier construction funding was 'unforeseen' cannot logically be squared with the Administration's multiple requests for funding for exactly that purpose dating back to at

---

Authority to transfer funds pursuant to Section 1520A of the Act is "subject to the same terms and conditions as transfers under section 1001." Congress has likewise limited the transfer of non-construction Department of Defense funds in 10 U.S.C § 2214(b) to transfers that (1) "provide funds for a higher priority item, based on unforeseen military requirements, than the items for which the funds were originally appropriated;" and (2) are not for "an item for which Congress has denied funds."

least early 2018." *Sierra Club*, 379 F. Supp. 3d at 914; *accord Sierra Club*, 929 F.3d at 690 ("[I]t is not credible that DoD did not foresee this requirement. The long history of the President's efforts to build a border barrier and of Congress's refusing to appropriate the funds he requested makes it implausible that this need was unforeseen.") And as to this requirement as well, Defendants' position is even less tenable than it was with respect to the FY2019 funds, as DoD specifically claimed a need for new border wall construction in its FY2020 budget request and requested funds from Congress for this purported need. *See* RJN ¶ 3, Ex. 3 at 8 (DoD budget requests "$3.6 billion for potential new construction for the border").

### b.  Defendants' wall-funding scheme is not authorized by Section 284.

In addition, although the Court has not previously issued a final ruling on this question Plaintiffs respectfully ask that the Court now hold that Defendants' massive wall-funding scheme is not authorized by Section 284. While the Supreme Court has stayed enforcement of this Court's injunction with respect to DoD's transfer authority based on the possibility that Plaintiffs lack a cause of action to challenge Defendants' unlawful transfers, it has not suggested that Plaintiffs could lack a cause of action with respect to Section 284. Even if the Supreme Court were to ultimately hold that Plaintiffs were required to satisfy a zone-of-interests test with respect to the statutes Defendants invoke, Supreme Court authority already establishes that Plaintiffs easily satisfy that test with respect to Section 284, because that statute explicitly focuses on the permissible use of land.

In *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, the Supreme Court considered a statute that "authorizes the acquisition of property 'for the purpose of providing land for Indians.'" 567 U.S. 209, 224 (2012) (citation omitted). The statute said nothing at all about construction, imposed no environmental or aesthetic restrictions, and was enacted entirely for the benefit of Indians. The Supreme Court nonetheless held that the "environmental" and "aesthetic" interests of non-Indians lay within the statute's bounds. *Id.* at 227–28. As the Supreme Court explained, it was of no moment that the plaintiff was "'not an Indian or tribal official seeking land' and does not 'claim an interest in advancing tribal development.'" *Id.* at 225 n.7 (citation omitted). Nor did it matter that the statute addressed only predicate land purchases, and said nothing at all

about construction—much less imposed any aesthetic or environmental restrictions. What mattered was that when the agency used its statutory powers, it did "not do so in a vacuum," but rather acted "with at least one eye directed" toward the ultimate use of the land it acquired. *Id.* at 226. And it was the ultimate use of the lands that the plaintiff objected to, as he claimed that construction would cause "an irreversible change in the rural character of the area," and cause "aesthetic, socioeconomic, and environmental problems." *Id.* at 213 (quotation omitted). This connection was sufficient.

If a plaintiff is within the zone of interests of a statute that was completely silent about land use because of asserted "economic, environmental, and aesthetic harm" from eventual construction, Plaintiffs' asserted interests here are certainly within the zone of interests of Section 284. Unlike the statute at issue in *Match-E-Be-Nash-She-Wish*, Section 284 explicitly addresses land use, referring to "[c]onstruction of roads and fences and installation of lighting." 10 U.S.C. § 284(b)(7). Moreover, the agency's Section 284 decision is even more closely tied to environmental interests than the land acquisition decision in *Match-E-Be-Nash-She-Wish*: in authorizing the Section 284 action, the Acting Secretary explicitly considered the environmental impact of the construction and determined responsibility for "environmental" compliance. Admin. R., ECF No. 18-1 at 23. The Supreme Court has held that decisions that "typically" involve consideration of a land's "eventual use" may be challenged by "neighbors to the use;" thus Plaintiffs are unquestionably proper challengers to construction decisions under Section 284, which *always* involves considerations of land use. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 227–28.

On the merits, Section 284 does not authorize Defendants' plan to funnel billions of dollars to border wall construction. Under Defendants' theory, DHS can request hundreds of miles of border wall ostensibly to counter drug smuggling, and, when Congress denies that request, DHS can simply reclassify the same hundreds of miles as an enormous "drug-smuggling corridor," Admin R., ECF No. 18-1 at 23, and thereby displace appropriations decision-making from Congress to the Secretary of Defense. It is implausible that Congress quietly granted the Secretary of Defense such unbounded authority through Section 284.

Interpretation of statutes "must be guided to a degree by common sense as to the manner in

which Congress is likely to delegate a policy decision of such economic and political magnitude." *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In determining the proper scope and location for wall construction, Congress engaged in a drawn-out and deliberative political process, involving consideration of constituents' (including Plaintiffs') advocacy. "The sheer amount of failed legislation on this issue demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (quotation omitted). There is no indication in Section 284 that Congress granted DoD the prerogative to short-circuit the political process. *See Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (quotation omitted)).

The structure and context of Section 284 reinforce the commonsense interpretation that Congress did not authorize multibillion-dollar public works to be constructed at the sole discretion of the Secretary of Defense. For example, Subsection (h)(1)(B) requires the Secretary to give Congress 15 days' written notice before providing certain forms of support, including "a description of any small scale construction project for which support is provided." The statute defines "small scale construction" as "construction at a cost not to exceed $750,000 for any project." 10 U.S.C. § 284(i)(3). Congress would not have required a description of "any small scale construction" projects if it were, at the same time, authorizing unspecified, massive, multibillion-dollar expenditures under this provision. As this Court previously observed, "Whether or not Section 284 formally 'limits' the Secretary to 'small scale construction' . . . reading the statute to suggest that Congress requires reporting of tiny projects but nonetheless has delegated authority to DoD to conduct the massive funnel-and-spend project proposed here is implausible, and likely would raise serious questions as to the constitutionality of such an interpretation." *Sierra Club*, 379 F. Supp. 3d at 917.

Defendants have urged that the Secretary of Defense may, over the course of two years, funnel more than $6 billion to a DHS border wall, when Congress has specifically refused to

provide more than a fraction of that funding to DHS or DoD for border wall construction. Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001), and there is no indication that Congress intended in Section 284 to grant the Secretary of Defense the sole discretion to determine whether billions of dollars would be spent on a border wall.

The historical use of Section 284 confirms that the administration's plan to use the statute to funnel more than $3.8 billion of military funds to border wall construction exceeds any authority Congress provided in that statute. The size of the projects Congress previously approved under this authority demonstrates how far Defendants propose to depart from the statute's reasonable contours. For example, Congress's 2006 decision to recommend a $10 million increase to Section 284 funding for fence and road construction, which Defendants previously cited to this Court, amounted to less than 1/380th (0.26%) of the administration's plan here. *See* H.R. Rep. No. 109-452, at 369 (2006). Similarly, in 2008, Congress contemplated a $5 million increase, or less than 1/760th (0.13%) of what Defendants seek to transfer here. *See* H.R. Rep. No. 110-652, at 420 (2008). As this Court observed, "Congress's past approval of relatively small expenditures, that were well within the total amount allocated by Congress to DoD under Section 284's predecessor, speaks not at all to Defendants' current claim that the Acting Secretary has authority to redirect" enormous sums to aggrandize border wall construction "in the face of Congress's appropriations judgment in the CAA." *Sierra Club*, 379 F. Supp. 3d at 917.

But even if Section 284 permitted the Secretary of Defense to make decisions of "vast economic and political significance," *Util. Air Regulatory Grp.*, 573 U.S. at 324 (quotation omitted), DoD's proposed use of Section 284 must be interpreted alongside the more specific and recent judgment by Congress embodied in the CAA. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133. "This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Id.* at 143. Therefore, "a specific policy embodied in a later . . . statute should control [judicial] construction of the [earlier broad] statute, even though it ha[s] not been expressly

amended." *Id.* (quotations omitted). Through the CAA, Congress placed a specific policy limitation on the scope and speed of border barrier construction, and Defendants' attempt to use Section 284 to evade these restrictions is unlawful.[3]

## II.   The Court Should Enjoin Defendants' Funnel-and-Spend Scheme.

As this Court has repeatedly found, Defendants' unlawful construction schemes should be permanently enjoined. There is no adequate remedy at law for Defendants' massive alteration of landscapes across hundreds of miles of border. *See Sierra Club*, 379 F. Supp. 3d at 924–25 ("The funding of border barrier construction, if indeed barred by law, cannot be remedied easily after the fact, and yet Defendants intend to commence construction immediately and complete it expeditiously."); *accord California*, 407 F. Supp. 3d at 903. And the balance of harms and public interest support enjoining Defendants so as to preserve "Congress' contrary exercise of its constitutionally-absolute power of the purse." *Id.* at 906; *accord Sierra Club*, 929 F.3d at 677 (public interest is "best served by respecting the Constitution's assignment of the power of the purse to Congress, and by deferring to Congress's understanding of the public interest as reflected in its repeated denial of more funding for border barrier construction").

And as with Defendants' previous construction, Plaintiffs' members face irreparable harm from construction in the areas Defendants have identified as El Paso A, El Paso B, El Paso C, El Paso D, Tucson A, Tucson B, Tucson C, San Diego A, Yuma A, Yuma B, Del Rio A, Del Rio B, and El Centro A.

Kevin Bixby has worked for decades to protect and conserve the unique landscapes found along the Rio Grande in New Mexico, and he works and recreates in the areas slated for construction in El Paso A, El Paso B, and El Paso D. Bixby Decl. ¶¶ 2. These lands include "one of the most beautiful, wild, and interesting parts of New Mexico," Bixby Decl. ¶ 11, and a massive wall project would irrevocably harm Mr. Bixby's ability to enjoy the rare ecosystems he has devoted decades to protecting and restoring, Bixby Decl. ¶¶ 8, 12–15. Rick LoBello also frequents the areas affected by construction in El Paso A and El Paso D, and has dedicated his life to

---

[3] For the additional reasons set forth in Plaintiffs' earlier briefing, Defendants' actions also violate the CAA, the National Environmental Policy Act, and the Constitution.

protecting the ecosystem around the border with the National Park Service, El Paso Zoo, and civic groups like Rotary International. LoBello Decl. ¶¶ 4–9. Wall construction in these areas would not only threaten the delicate ecological balance he has spent his life protecting, but "alter the landscape of [his] daily life" as a "menacing symbol that is contrary to the spirit of [his] community." LoBello Decl. ¶¶ 8, 10. Gary W. Roemer, a professor at New Mexico State University, studies and recreates in the lands near El Paso Project B. Roemer Decl. ¶¶ 3, 10–11. Construction in these areas would hamper his studies on the genetic relationship of wildlife in the area, and diminish his enjoyment of the scenic vistas surrounding the project area. Roemer Decl. ¶¶ 12–18.

Judy Ackerman, who retired after 26 years of military service, now volunteers with the Texas Master Naturalist program as hike leader and natural environment educator. Ackerman Decl. ¶¶ 2–3. She is a regular visitor to the areas affected by the El Paso D project, including Mount Cristo Rey and the Chamizal national memorial. Ackerman Decl. ¶¶ 7–10. Defendants' proposed 30-foot border wall would be "a blight" on the lands Ms. Ackerman loves and "violent to the spirit" of the unique border communities in which she makes her home. Ackerman Decl. ¶¶ 7, 9. Howard J. Dash similarly fears that construction of the El Paso D wall segment would destroy what he loves most about hiking Mount Cristo Rey, "ruin[ing] the sweeping panoramic vista provided by this mountaintop by placing a big, ugly wall in front of me and anyone else who has hiked to the top of the mountain," and marring his feeling of connection to the landscape and interconnected peoples of Mexico and New Mexico. Dash Decl. ¶¶ 10–12.

Elizabeth Walsh has dedicated her career to the environment: she is a professor who studies desert ecosystems and has pursued "advocacy on behalf of wildlife in the border region" for more than two decades. Walsh Decl. ¶¶ 3–4. Dr. Walsh regularly samples water near the El Paso C project as part of her studies, and also hikes and bird-watches in the area. Walsh Decl. ¶¶ 8, 10. In addition to the effects of construction on the habitats Dr. Walsh studies and the species she watches, a wall would "be a major disruption" to her enjoyment of nature: it "is not part of the natural landscape, and would detract from the connection I have with nature in that area. It would also ruin the views of the vast desert landscape and the feeling of boundlessness." Walsh Decl. ¶ 12.

Robert Ardovino, who has "visited, studied, photographed, and recreated in the desert lands of southern New Mexico and Arizona [his] entire life," would be harmed by construction in El Paso B, El Paso C, Tucson A, and Tucson B. Ardovino Decl. ¶¶ 5, 6. Mr. Ardovino grew up in the El Paso C area, and owns nearby property. Ardovino Decl. ¶ 14. Because he lives so close, he visits areas affected by this project nearly every other week, where he enjoys "beautiful rolling hills, vast open scrublands, and wildflowers throughout the landscape." Ardovino Decl. ¶ 14. Mr. Ardovino also "generally go[es] to the Tucson A and El Paso B Project Areas at least ten to twelve times a year, and sometimes more frequently." Ardovino Decl. ¶ 11. There, he "experience[s] the vastness of the wilderness," obstructed only by smaller fences that "are not intrusive in the way that a 30-foot steel structure will be." Ardovino Decl. ¶ 12. Similarly, Mr. Ardovino has "continued to return to the Tucson B Project Area for decades because the area provides [him] a way to get 'away' and be out in the open." Ardovino Decl. ¶ 9. Defendants' massive construction project would "destroy the reason [he] visit[s]" El Paso B and Tucson A, and would deface the desert surrounding his home in El Paso C, which he has known his whole life. Ardovino Decl. ¶¶ 12, 16. As to Tucson B, Mr. Ardovino "would no longer have a reason to return." Ardovino Decl. ¶ 9.

Sarah Roberts frequently hikes in areas affected by construction in the Tucson A, B, and C projects. Roberts Decl. ¶¶ 4–5, 8–9, 13, 16. She has enjoyed these areas for over forty years and is concerned that border wall construction will encroach onto the remaining wild areas she can access. Roberts Decl. ¶ 9. She has already been forced to stop hiking in nearby areas that have "become a denuded, militarized construction zone." Roberts Decl. ¶ 7. Linda Whitaker lives near the border and "frequently hike[s] in the areas along the border identified as Tucson Project B and Project C." Whitaker Decl. ¶ 4. She loves the birds and natural landscape of Southern Arizona, and has enjoyed them for over two decades. Whitaker Decl. ¶ 9. Defendants' plan to construct a "30-foot bollard wall would destroy the beauty of this area, in addition to harming local species and increasing the risk of flooding." Whitaker Decl. ¶ 9. Christie Brown, who volunteers in part due to her passion for native plants, also frequently hikes in the mountains surrounding the Tucson B construction. Brown Decl. ¶¶ 7–8, 10. If construction commences "in many places [she] would see a wall instead of this broad expansive natural landscape." Brown Decl. ¶ 7. Jo Ann Caruthers also frequently visits the

border areas around Coronado National Monument and Copper Canyon and has been monitoring wildlife for over 15 years. Caruthers Decl. ¶¶ 4–5. Wall construction in Tucson Project B would diminish her ability to study and enjoy the area's migratory animals, and disrupt the natural landscape she treasures. Caruthers Decl. ¶¶ 6–10.

Melissa Owen owns and resides at the Sierra Vista Ranch, which borders the Buenos Aires National Wildlife Refuge ("BANWR") and protects the natural environment. Owen Decl. ¶ 4. She visits the BANWR almost daily, and construction in Tucson Project C threatens a landscape she has devoted years of her life to protecting. Owen Decl. ¶¶ 4, 6–9. Defendants' plan to convert a wildlife refuge on an "extremely remote desert" into a floodlit construction zone would harm her work and enjoyment of the natural environment in which she has made her home. Owen Decl. ¶ 8. Janay Maurine Brun also frequently visits the BANWR and surrounding areas, and has done so as a resident, wildlife researcher and volunteer for well over a decade. Brun Decl. ¶¶ 3–4. "Hiking, camping, and observing local species in the BANWR and Coronado Forest area are important parts of [her] life." Brun Decl. ¶ 14. In addition to her wildlife monitoring, she hikes and visits lands affected by construction in Tucson Project B and Tucson Project C, including the "areas around the ghost town of Ruby and Bear Valley Ranch, specifically the California Gulch and Sycamore Canyon areas." Brun Decl. ¶ 8. Ms. Brun has witnessed first-hand the damage caused by a previous, much smaller wall in the area; Defendants' plan to erect a much larger and more damaging wall throughout the region "would be the final nail on the coffin of a rich and diverse area." Brun Decl. ¶ 14.

Juan Benito Mancias is the Chair of the Esto'k Gna tribe, whose ancestral lands include areas covered by the Del Rio A and Del Rio B projects. Mancias Decl. ¶ 4. Documentation of the tribe's presence in the area stretches back centuries. After a mass grave was unearthed in the area in 1871, Mr. Mancias's great-great-grandfather provided evidence of an 1801 massacre he survived there. Mancias Decl. ¶ 14. "It is important to [Mr. Mancias] to spend time on this land because it has so much history for [his] tribe." Mancias Decl. ¶ 15. Wall construction threatens to desecrate this history, and "[c]onstructing a large border wall across [his] tribe's villages and disturbing the

remains of [their] ancestors would take away a piece of [his] identity and the identity of all of [his] tribe." Mancias Decl. ¶ 19.

Jerry Thompson, a professor who studies the history of the border, has been visiting the sites identified as Del Rio A and Del Rio B for around five decades. Thompson Decl. ¶¶ 12–15. He is concerned that Defendants' efforts to rapidly erect a border wall will "cut off an essential area of research for me forever and irrevocably damage the archaeological history of the area." Thompson Decl. ¶ 22. This concern is well-founded: with respect to construction Defendants embarked upon last year, a federal government study produced by the National Park Service itself concluded that numerous archaeological sites "likely will be wholly or partially destroyed by the forthcoming border fence construction." RJN ¶ 5, Ex. 5 at 17.

Laura Chamberlin's "family has lived in Yuma for generations," and she regularly visits them, hiking or walking trails in the Yuma A region. Chamberlin Decl. ¶¶ 5–7. While much of the surrounding desert is dry, the trails she hikes and bikes in Yuma A are close to the Colorado River and "provide a way for [her] to reconnect with the natural landscape of this region each time [she] visit[s]." Chamberlin Decl. ¶ 8. Defendants' border wall would intrude on her enjoyment of the trails, and mar the "sweeping views of the surrounding mountain ranges visible from [her family] property—including the Gilas, Cabeza Prieta, Cargo Muchacho, [and] Castle Dome." Chamberlin Decl. ¶¶ 9–11. Karla Terry regularly walks and drives with her father in the Yuma A and B areas. Terry Decl. ¶¶ 7–8, 15, 18. Construction in Yuma A threatens the quiet walks they take together near her father's home, in the open desert. Terry Decl. ¶ 9. If the horizon they love were replaced with "a giant wall," their walks in the area would end, and their scenic drives through open desert would no longer have any purpose. Terry Decl. ¶¶ 11, 17. As Ms. Terry explains, "[t]here is no beauty in feeling caged in." Terry Decl. ¶ 11. Similarly, if construction in Yuma B proceeds, Ms. Terry would cease taking scenic drives there to enjoy "the gorgeous desert views," which help her "understand the natural flow of the living desert, with the animals, open fields, and canals leading to the Colorado River." Terry Decl. ¶¶ 19–20. She would "miss taking these scenic drives greatly, but . . . would rather drive in an area that is already built up then to witness the destruction of this beautiful landscape." Terry Decl. ¶ 21.

Michael L. Rood is an avid hiker, bird watcher, and camper who has lived in Imperial County, California, for most of his life. Rood Decl. ¶¶ 2–3. Together with his wife, he has "hiked over 100 miles of the historic Pacific Crest Trail (PCT) from the Mexican border north to Warner Springs," and intends to return this year. Rood Decl. ¶ 10. Wall construction in San Diego A would be "visible for miles as it will rise many feet above the shrubland," and "present an artificial modern scar across this area of mountains presently covered by chaparral." Rood Decl. ¶ 10. Mr. Rood also frequently hikes in the proposed El Centro A project area, which is located in a "remarkable and wild area of Imperial and San Diego Counties." Rood Decl. ¶ 6. Defendants' massive wall project would detract from "the pristine beauty of this area," and threaten his use and enjoyment of this "very rugged area of mountains, valleys, and huge granite boulders," which includes "ancient Indian trails," artifacts, and wildlife. Rood Decl. ¶¶ 6–9.

Henry Nichols Ervin would likewise be harmed by construction in the El Centro A project. He has hiked the Jacumba Mountains for approximately 40 years, "care[s] deeply about the desert wilderness," and has worked for decades to conserve its "rugged desert ecosystem," including through work on the California Desert Protection Act. Ervin Decl. ¶¶ 2, 6. His enjoyment of areas including Skull Valley, Myer Valley, Valley of the Moon, Smugglers Cave, and the views from Blue Angels Peaks would be greatly diminished if Defendants were to run a massive construction project through the wilderness, which would include not only the 30-foot wall but also the construction of roads to bring in heavy equipment. Ervin Decl. ¶¶ 7–13. Carmina Ramirez "regularly hike[s] and visit[s] the stretch of the border where the El Centro Project A is proposed." Ramirez Decl. ¶ 4. Defendants' proposed construction will alter her enjoyment of sites along the border, including the views from the Desert View Tower and the hiking areas surrounding the Imperial Valley Desert Museum. Ramirez Decl. ¶¶ 5–6. Edith G. Harmon lives "just to the east of the Jacumba Mountains." Harmon Decl. ¶ 6. "This desert is [her] home and where [her] heart is." Harmon Decl. ¶ 8. She has hiked for decades and hundreds of miles through the Jacumba Mountains Wilderness Area and explains that, due to the rugged remoteness of the landscape, "it is hard to overstate how destructive the construction process for the El Centro A wall would be to the environment of the Jacumba Mountains Wilderness that I love." Harmon Decl. ¶¶ 9–10, 15. For Ms.

Harmon and others who treasure this designated wilderness, Defendants' unlawful wall construction—which dispenses with even minimal environmental review and protections—is "an insult to the environment and to the values for which this wilderness was designated in 1994," and "an insult to the people like me that live here." Harmon Decl. ¶ 16.

## CONCLUSION

For the reasons stated above, Plaintiffs ask that the Court grant their Motion for Partial Summary Judgment and order injunctive and declaratory relief.


Dated: April 13, 2020                               Respectfully submitted,

                                                    */s/ Dror Ladin*
                                                    _____
                                                    Dror Ladin*
Sanjay Narayan (SBN 183227)***                      Noor Zafar*
Gloria D. Smith (SBN 200824)***                     Jonathan Hafetz**
Sierra Club Environmental Law Program               Hina Shamsi**
2101 Webster Street, Suite 1300                     Omar C. Jadwat**
Oakland, CA 94612                                   American Civil Liberties Union Foundation
Tel: (415) 977-5772                                 125 Broad Street, 18th Floor
sanjay.narayan@sierraclub.org                       New York, NY 10004
gloria.smith@sierraclub.org                         Tel: (212) 549-2500
                                                    Fax: (212) 549-2564
Mollie M. Lee (SBN 251404)                          dladin@aclu.org
American Civil Liberties Union Foundation           nzafar@aclu.org
    of Northern California, Inc.                     jhafetz@aclu.org
39 Drumm Street                                     hshamsi@aclu.org
San Francisco, CA 94111                             ojadwat@aclu.org
Tel: (415) 621-2493
Fax: (415) 255-8437                                 Cecillia D. Wang (SBN 187782)
mlee@aclunc.org                                     American Civil Liberties Union Foundation
                                                    39 Drumm Street
David Donatti**                                     San Francisco, CA 94111
Andre I. Segura (SBN 247681)                        Tel: (415) 343-0770
American Civil Liberties Union Foundation           Fax: (415) 395-0950
    of Texas                                        cwang@aclu.org
P.O. Box 8306
Houston, TX 77288
Tel: (713) 325-7011                                 *Counsel for Plaintiffs*
Fax: (713) 942-8966
ddonatti@aclutx.org                                 **Admitted* pro hac vice
asegura@aclutx.org                                  ***Application for admission* pro hac vice
                                                        *forthcoming*
                                                    ****Counsel for Plaintiff* Sierra Club