JOSEPH H. HUNT
Assistant Attorney General
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:     (202) 616-5084
Fax:      (202) 616-8470
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
|---|---|
| SIERRA CLUB, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>                    Defendants. | No. 4:20-cv-01494-HSG<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING FISCAL YEAR 2020 BORDER BARRIER PROJECTS PURSUANT TO 10 U.S.C. § 284; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: None per Court Order (ECF No. 15) |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ...................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................3

STANDARD OF REVIEW ..................................................................................................6

ARGUMENT ......................................................................................................................6

    I.    Plaintiffs' Recreational and Aesthetic Interests Fall Outside the
           Zone of Interests of § 8005. ........................................................................6

    II.   Section 8005 Authorized DoD's Transfer of Funds ........................................8

    III.  DoD's Use of § 284 Counter-Drug Support Authority is Lawful. ............... 11

    IV.  Plaintiffs' Remaining Statutory and Constitutional Arguments Lack Merit. ............ 16

    V.   Plaintiffs Have Not Met the Requirements for a Permanent Injunction. ................... 16

        A.   An Injunction Will Impose Substantial and Irreparable Harm on Defendants ............. 17

        B.   Defendants' Interests Decisively Outweigh Plaintiffs' Recreational and Aesthetic
            Interests. .................................................................................... 18

    V.   The Court Should Stay Any Injunction Pending Appeal.. ........................................ 23

CONCLUSION ................................................................................................................ 24

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG - Defs.' MSJ & Opp'n re: FY20 § 284

i

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*California v. Trump,*
  407 F. Supp. 3d 869 (N.D. Cal. 2019) ................................................................ 8, 23

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................................... 6

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ............................................................................................... 3

*Ctr. for Biological Diversity v. Trump,*
  2020 WL 1643657 (D.D.C. Apr. 2, 2020) ................................................... 7, 12, 13

*Delta Data Sys. Corp. v. Webster,*
  744 F.2d 197 (D.C. Cir. 1984) ............................................................................... 9

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120, (2000) ............................................................................................ 16

*Hernandez v. Mesa,*
  140 S. Ct. 735 (2020) ......................................................................................... 7, 8

*Hughes Air Corp. v. Public Util. Comm'n,*
  644 F.2d 1334 (9th Cir. 1981) ............................................................................. 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ............................................................................................ 12

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ............................................................................................ 22

*Nat'l Treasury Employees Union v. Von Raab,*
  489 U.S. 656 (1989) ...................................................................................... 17, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ................................................................................. 6, 12, 13

*Nevada Land Action Ass'n v. U.S. Forest Serv.,*
  8 F.3d 713 (9th Cir. 1993) ................................................................................... 13

*N. Cheyenne Tribe v. Norton,*
  503 F.3d 836 (9th Cir. 2007) ............................................................................... 17

*Osborn v. Am. Ass'n of Retired Persons,*
  660 F.2d 740 (9th Cir. 1981) ............................................................................... 10

*Nken v. Holder,*
  556 U.S. 418 (2009) ...................................................................................... 17, 23

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG - Defs.' MSJ & Opp'n re: FY20 § 284

ii

*Russello v. United States,*
  464 U.S. 16 (1983) ............................................................................................ 14

*Sierra Club v. Trump,*
  379 F. Supp. 3d 883 (N.D. Cal. 2019) .................................................. 6, 7, 10, 11

*Sierra Club v. Trump,*
  929 F.3d 670 (9th Cir. 2019) ................................................................. 5, 7, 8, 10

*Sierra Club v. Trump,*
  2019 WL 2715422 (N.D. Cal. June 28, 2019) ................................... 7, 10, 11, 18

*Sierra Club v. Trump,*
  No. 19-17501 (9th Cir. Dec. 30, 2019) ............................................................ 23

*Thompson v. N. Am. Stainless, LP,*
  562 U.S. 170–77 (2011) ................................................................................... 12

*Trump v. Sierra Club,*
  140 S. Ct. 1 (2019) ................................................................... 2, 7, 16, 17, 18, 23

*United States v. Guzman-Padilla,*
  573 F.3d 865 (9th Cir. 2009) ........................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................. 17, 18, 22

**Statutes:**

10 U.S.C. § 284 ................................................................................................ passim

10 U.S.C. § 2808 ................................................................................... 2, 8, 10, 23

42 U.S.C. § 4321 ..................................................................................................... 6

Consolidated Appropriations Act, 2020
  Pub L. No. 116-93, Div. D, § 209 .................................................................... 3, 16
  Pub L. No. 116-93, Div. A, § 8005 ............................................................... passim
  Pub L. No. 116-93, Div. A, § 9002 .................................................................... 1, 5

National Defense Authorization Act, 2020
  Pub L. No. 116-92, Title X, § 1001 ...................................................................... 5
  Pub L. No. 116-92, Title XV, § 1520A.................................................................. 5

Illegal Immigration Reform and Immigrant Responsibility Act
§ 102 (codified at 8 U.S.C. § 1103 note) ........................................................................ 5

**Legislative Materials:**

H.R. 2740, 116th Cong., Div. C, Title VI ........................................................................ 3

H.R. 2500, 116th Cong., Title X, § 1011 ........................................................................ 3

H.R. Rep. No. 103-200 (1993) ...................................................................................... 14

H.R. Rep. No. 109-452 (2006) ...................................................................................... 15

H.R. Rep. No. 110-385 (2007) ...................................................................................... 15

H.R. Rep. No. 110-652 (2008) ...................................................................................... 15

**Rules:**

Federal Rules of Civil Procedure 54, 56 .......................................................................... 6

**Regulations:**

85 Fed. Reg. 14953–66 (Mar. 16, 2020) .......................................................................... 6

**Other Authorities:**

GAO Opinion B-330862,
2019 WL 4200949 (Sept. 5, 2019) ......................................................................... 9, 11

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG - Defs.' MSJ & Opp'n re: FY20 § 284

iv

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that Defendants hereby move the Court pursuant to Federal Rules of Civil Procedure 54(b) and 56 for partial summary judgment with respect to the funding and construction of border barrier projects undertaken in fiscal year 2020 pursuant to 10 U.S.C. § 284. The motion is based on the following Memorandum of Points and Authorities in support of Defendants' motion and in opposition to Plaintiffs' motion for partial summary judgment, as well as all previous filings in this action, including the certified administrative record.  In accordance with the order establishing procedures for briefing this matter, *see* ECF No. 15, Defendants hereby incorporate by reference all prior arguments asserted in *Sierra Club et al. v. Trump et al.*, 4:19-cv-00872-HSG (*Sierra Club I*) and *State of California et al. v. Trump et al.*, 4:19-cv-00872-HSG (*California I*), including arguments submitted to the Ninth Circuit and the Supreme Court.  *See* Nos. 19-16102, 19-16300, 19-16299, 19-16336, 19-17501, 19-17502, 20-15044 (9th Cir.); *Trump v. Sierra Club*, 19A60 (S. Ct.).

**MEMORANDUM OF POINTS AND AUTHORITIES**

Enormous quantities of illegal drugs are flowing into our Nation through the southern border. In response to this crisis, and pursuant to longstanding statutory authority (10 U.S.C. § 284), the Department of Homeland Security (DHS) asked the Department of Defense (DoD) to support its counter-narcotics operations by building barriers in several high priority drug-smuggling corridors between ports of entry.  To fund these projects, DoD executed an internal transfer of funds pursuant to its general and special transfer authority in accordance with the requirements of § 8005 and § 9002 of the DoD Appropriations Act, 2020, *see* Pub. L. No. 116-93, 133 Stat. 2317.  The Court should not enjoin that transfer of funds or prevent DoD from providing critical counter-drug support to DHS.

Summary judgment should be granted in Defendants' favor because Plaintiffs fall outside of the zone of interests protected by § 8005 and therefore lack a cause of action to enforce it.  Section 8005 governs DoD's internal transfer of appropriated funds among DoD's own budget accounts and has nothing to do with any effect the subsequent expenditure of those funds would have on Plaintiffs' recreational and aesthetic interests in the land where barrier construction will occur.  This conclusion is confirmed by the Supreme Court's stay of an earlier injunction issued by this Court addressing the

fiscal year 2019 § 284 border barrier projects funded by a transfer of funds pursuant § 8005. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). Foremost "[a]mong the reasons" for granting a stay, the Supreme Court emphasized that the Government had "made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.*

Moreover, DoD's transfer of funds was consistent with the requirements of § 8005. In authorizing appropriations to DoD in fiscal year 2020 with full awareness of DoD's prior use of § 8005 to fund § 284 construction, Congress granted DoD the same authority to transfer funds among DoD's internal accounts to accommodate higher priority military requirements that are unforeseen and have not been denied by Congress. The counter-drug projects at issue here were neither foreseen nor denied during the budget process that led to the passage of DoD's fiscal year 2020 appropriations.

Plaintiffs also fall outside the zone of interests protected by § 284 and, even if they could bring a claim on the merits, the requirements of § 284 are satisfied here. Contrary to Plaintiffs' contention, there is no implied limit on the scope or scale of the support DoD may provide under § 284. Nor do the appropriations to DHS in the Consolidated Appropriations Act prevent DoD from funding or undertaking border barrier construction pursuant to § 284.

The Court should deny Plaintiffs' request for a permanent injunction. Defendants have compelling interests in border security, drug interdiction, and preventing cross-border criminal activity. Defendants would also face significant irreparable harm from the entry of a permanent injunction because it would prevent DoD from obligating approximately $2.2 billion dollars that will permanently lapse at the end of the fiscal year, as well as impose significant unrecoverable expenses for stopping ongoing work on the projects. These interests far outweigh Plaintiffs' recreational and aesthetic concerns, as confirmed by the Supreme Court's stay order that resolved this same balance of equities in Defendants' favor.

At a minimum, the Court should stay any injunction pending appeal. The Supreme Court's stay of the Court's earlier injunction was a clear directive that funding and construction for § 284 projects should be permitted to proceed until final resolution of the appeal process. In light of the Supreme Court's ruling, the Court should follow the same approach it adopted in the litigation concerning the projects undertaken pursuant 10 U.S.C. § 2808 and grant a stay.

## BACKGROUND[1]

On December 20, 2019, the President signed into law the Consolidated Appropriations Act, 2020 (FY20 CAA), which appropriated funds for the 2020 fiscal year to various federal agencies, including DHS. *See* Pub. L. No. 116-93, 133 Stat. 2317. Section 209 of the DHS Appropriations Act, 2020 (a component of the FY20 CAA), *see id.* Div. D, appropriated $1.375 billion to DHS "for the construction of barrier system along the southwest border."  Congress expressly considered several restrictions limiting DoD's use of § 284 and § 8005, but none of these restrictions was enacted into law. *See, e.g.*, H.R. 2740, 116th Cong., Div. C, Title VI; H.R. 2500, 116th Cong., Title X, § 1011.

On January 14, 2020, in accordance with the requirements of § 284, DHS requested DoD's assistance to construct 38 discrete border barrier project segments located in drug-smuggling corridors along the southern border.  *See* Administrative Record (AR) at 28–43 (ECF No. 19).  Section 284 authorizes DoD to "provide support for the counterdrug activities . . . of any other department or agency," if "such support is requested."  *Id.* § 284(a).  This support explicitly includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(b)(7).  DHS's request sought the construction of new fencing as well as the replacement of existing vehicle barriers and dilapidated fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting.  AR at 28–29.

On February 7, 2020, the Secretary of Defense approved construction and funding for 31 project segments.  *See* AR at 1–11.[2]  Plaintiffs challenge the construction of all 31 projects listed below. *See* Pls.' Motion at 1.

---

[1] Defendants incorporate by reference the previous background sections contained in Defendants' prior briefs addressing the fiscal year 2019 § 284 projects. *See Sierra Club* I, ECF Nos. 64, 181. The background section in this brief focuses on factual issues unique to the fiscal year 2020 § 284 projects.

[2] On April 24, 2020, DHS submitted a revised request for assistance to DoD that requested several changes to locations of the projects. *See* Declaration of Paul Enriquez (Exhibit 1) ¶ 5. For example, El Centro A was initially 10 miles, *see* AR at 6, 33, but DHS requested that the project be reduced to approximately 3 miles. *Id.* ¶ 5.

| Project | Description |
|---|---|
| San Diego A (Segments 1–3) | 3 miles of new primary pedestrian fencing and 14 miles of replacement pedestrian fencing in San Diego County, CA |
| El Centro A (Segment 1) | 3 miles of new pedestrian fencing in Imperial County, CA |
| Yuma A (Segments 1–2) | 7 miles of vehicle barriers replaced with new pedestrian fencing on the federal Cocopah Reservation and 9 miles of replacement secondary pedestrian fencing in Yuma County, AZ |
| Yuma B (Segments 1–2) | 0.5 miles of replacement primary pedestrian fencing and 0.5 miles of new secondary pedestrian fencing located in Imperial County, CA on the Quechan Reservation |
| El Paso A (Segment 1) | 20 miles of replacement primary pedestrian fencing in El Paso County, TX |
| El Paso B (Segment 6) | 2 miles of new pedestrian fencing in Luna County, NM |
| El Paso C (Segments 1–2) | 13 miles of replacement pedestrian fencing in Dõna Ana and Luna Counties, NM |
| El Paso D (Segments 1–4) | 3 miles of replacement secondary pedestrian fencing and 18 miles of replacement primary pedestrian fencing in El Paso County, TX, and 0.5 miles of new primary pedestrian fencing in Dõna Ana County, NM |
| Tucson A (Segments 1–5) | 24 miles of replacement primary pedestrian fencing, 1 mile of replacement secondary pedestrian fencing, and 4.5 miles of new primary pedestrian fencing in Cochise County, AZ |
| Tucson B (Segments 1, 3–6) | 2 miles of replacement primary pedestrian fencing and 27.5 miles of new pedestrian fencing in Santa Cruz and Cochise Counties, AZ |
| Tucson C (Segments 1, 3–4) | 7 miles of replacement primary pedestrian fencing and 8 miles of new primary pedestrian fencing in Santa Cruz and Pima Counties, AZ |
| Del Rio A (Segment 1) | 2 miles of replacement pedestrian fencing in Maverick County, TX |
| Del Rio B (Segment 1) | 2 miles of replacement pedestrian fencing in Val Verde County, TX |

*See* AR at 30–42; *see also* Declaration of Paul Enriquez ¶¶ 14–31 (Exhibit 1) (describing projects).

The Secretary of Defense concluded that DHS identified each project location as a drug-smuggling corridor in accordance with § 284(b)(7). *See* AR at 1–7, 9. The United States Border Patrol collectively had over 2,900 separate drug-related events in fiscal year 2019 between border crossings in the six border patrol sectors where the barriers will be built. *See* AR at 30–42. These encounters resulted in the seizure of approximately 76,000 pounds of marijuana, 1600 pounds of cocaine, 600 pounds of heroin, 11,000 pounds of methamphetamine, and 171 pounds of fentanyl. *See id.*

The construction of new fencing in these areas is required to close gaps between segments of

existing fencing and add needed barriers in locations where none currently exist. *See* AR at 30–32, 35, 38–39. The replacement of existing pedestrian fencing and vehicle barriers is necessary because the older designs are easily breached and have been damaged to such an extent that they are ineffective. *See* AR at 30–31, 33–35, 38–39, 41. Further, transnational criminal organizations and drug cartels have adapted their tactics to evade the existing barriers. *See id.* at 30–33, 35, 38. DHS thus requires new barrier infrastructure to impede and deny illegal narcotics smuggling. *See id.* at 28–29.

To fund these projects, the Secretary of Defense authorized the transfer of $3.831 billion to the counter narcotics support line of the Drug Interdiction and Counter-Drug Activities, Defense, appropriation. *See* AR at 1–7 13–14. The transferred funds were available as either early or excess to DoD's current programmatic needs for various aircraft, vehicles, ships, and equipment. *See id.* at 17–21. The Secretary of Defense determined, based on an assessment from the Chairman of the Joint Chiefs of Staff, that the transfer of funds would not impact the military preparedness of the United States. *See id.* at 3, 6, 14, 65.

The Secretary directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act, 2020 (a component of the FY20 CAA), *see* Pub. L. No. 116-93, 133 Stat 2317, Div. A, and § 1001 of the National Defense Authorization Act for Fiscal Year 2020 (NDAA), *see* Pub. L. No. 116-92, 133 Stat. 1198, Title X, and DoD's special transfer authority under § 9002 of the FY20 DoD Appropriations Act and § 1520A of the FY20 NDAA. *See* AR at 1–7, 13–14. These provisions collectively authorize DoD to transfer up to $6 billion between appropriations in fiscal year 2020 provided "[t]hat the authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." FY20 CAA, Div. A, § 8005. The Secretary concluded the transfer at issue here met these requirements. *See* AR at 6, 13–14.[3]

---

[3] Because § 1001, § 1520A, and § 9002 incorporate § 8005 by reference or are subject to the same substantive requirements as § 8005, this motion refers to these requirements collectively by reference to § 8005. *See Sierra Club v. Trump*, 929 F.3d 670, 682 n.7 (9th Cir. 2019).

On March 16, 2020, the Acting Secretary of Homeland Security exercised his authority under § 102(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, to waive the application of various federal and state laws to ensure expeditious construction of all but one small segment of the projects.[4] *See* Determinations Pursuant to Section 102 of IIRIRA, as Amended, 85 Fed. Reg. 14953–66 (Mar. 16, 2020).  The waived laws include the National Environmental Policy Act (42 U.S.C. 4321 *et seq.*) along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes." *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences most favorably to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  Where the parties have filed cross-motions for partial summary judgment, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  *See* Fed. R. Civ. P. 54(b).

## ARGUMENT

### I.   Plaintiffs' Recreational and Aesthetic Interests Fall Outside the Zone of Interests of § 8005.

Plaintiffs' challenge to DoD's transfer of funds fails because their alleged recreational and aesthetic interests fall outside the zone of interests protected by the limitations in § 8005.[5]

As an initial matter, the zone-of-interests requirement indisputably applies to Plaintiffs' cause of action brought under the Administrative Procedure Act (APA) alleging that DoD acted in excess

---

[4] DHS issued a separate waiver for each border patrol sector in which the projects will be constructed.  The waiver for the Tucson sector, however, inadvertently omitted a 0.2 mile segment (Tucson B, segment 4) in its description of the proposed construction area.  *See* Enriquez Decl. ¶ 23; AR at 5.  DHS is currently working to correct this omission.  *See* Enriquez Decl. ¶ 23.

[5] Unlike the prior § 284 litigation, Plaintiffs do not advance any organizational mission interests based on allegations of diverting resources.  *See Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925–26 (N.D. Cal. 2019) (rejecting Southern Border Communities Coalition's diversion-of-resources argument).  Plaintiffs' rely exclusively on alleged injuries to their members' use and enjoyment of the land where barrier construction will occur.  *See* Pls.' Motion at 13–19.

of § 8005's statutory authority. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012); *see also* Pls.' Complaint ¶¶ 135–38 (ECF 1). As explained in prior briefing, Plaintiffs' aesthetic and recreational interests are not within the zone of interests protected by § 8005. *See Sierra Club I* (ECF Nos. 64, 146, 181, 236, 247); *Sierra Club et al v. Trump et al.*, Nos. 19-16102 *et al.*, 19-17501 *et al.* (9th Cir.); *Trump v. Sierra Club*, 19A60 (S. Ct.).

The decisions from this Court and the Ninth Circuit motions panel on the zone-of-interests issue in the prior § 284 litigation are not preclusive of this conclusion, as they did not address APA claims or whether Plaintiffs' satisfy the zone of interests requirement for § 8005. *See Ctr. for Biological Diversity v. Trump*, No. 1:19-CV-00408 (TNM), 2020 WL 1643657, at *21 (D.D.C. Apr. 2, 2020) (dismissing APA claims by environmental plaintiffs because they did not fall within the zone of interests of § 8005). Instead, those decisions—incorrectly in Defendants' view—focused on the Plaintiffs' implied ultra vires claims, with this Court concluding that the zone-of-interests test does not apply to ultra vires claims that seek "equitable relief" against Defendants "for exceeding [their] statutory authority." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 910 (N.D. Cal. 2019); *Sierra Club v. Trump*, 2019 WL 2715422, at *3 (N.D. Cal. June 28, 2019). The Ninth Circuit motions panel expressed skepticism whether the "zone of interests test applies" to a non-statutory ultra vires claim, but concluded that, "[t]o the extent" it does apply, "it requires [the court] to ask whether Plaintiffs fall within the zone of interests of the Appropriations Clause, not of § 8005." *See Sierra Club v. Trump*, 929 F.3d 670, 700–04 (9th Cir. 2019). *But see id.* at 707–20 (N.R. Smith, J., dissenting) (concluding that Plaintiffs raise only statutory claims and fall outside the zone of interests of § 8005). The Ninth Circuit went on to hold that Plaintiffs' recreational and aesthetic interests fell within the zone of interests required to enforce the Appropriations Clause. *See id.* at. 704.

The Supreme Court, however, rejected the Ninth Circuit's reasoning in granting a stay of this Court's injunction. "Among the reasons" for granting a stay, the Supreme Court emphasized that Defendants had "made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump*, 140 S. Ct. at 1. Moreover, the fact that Plaintiffs bring an express cause of action under the APA for a violation of § 8005 further underscores why they should not be able to evade the zone-of-interests requirement

simply by asserting an implied equitable ultra vires claim that is indistinguishable from their APA claim. *See Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) ("It would be 'anomalous to impute a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action.'" (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975)).

Defendants recognize that this Court previously concluded that it remains bound by the Ninth Circuit's stay opinion, notwithstanding the Supreme Court's intervening order. *See California v. Trump*, 407 F. Supp. 3d 869, 884–85 (N.D. Cal. 2019). Defendants respectfully submit that the Court's decision regarding the binding nature of the Ninth Circuit's motions panel's decision is incorrect for the reasons asserted in prior briefing. *See Sierra Club I*, ECF Nos. 236, 247; *Sierra Club et al v. Trump et al.*, Nos. 19-16102 *et al.*, 19-17501 *et al.* (9th Cir.).

Applying the reasoning of Ninth Circuit motions panel's decision and the Court's prior decision addressing the border barrier projects undertaken pursuant to 10 US.C. § 2808, Defendants acknowledge that under those decisions Plaintiffs may challenge Defendants' fiscal year 2020 transfer of funds pursuant to § 8005 through an implied equitable action to enjoin an alleged violation of the Appropriations Clause and Plaintiffs' fall within any zone of interests required to enforce that Clause's provisions. *See Sierra Club*, 929 F.3d at 700–04; *California*, 407 F. Supp. 3d at 885–86. Defendants disagree with these conclusions for the reasons previously presented to this Court, the Ninth Circuit, and the Supreme Court. *See Sierra Club I*, ECF Nos. 64, 146, 181, 236, 247; *Sierra Club et al v. Trump et al.*, Nos. 19-16102 *et al.*, 19-17501 *et al.* (9th Cir.); *Trump v. Sierra Club*, 19A60 (S. Ct.). As explained therein, the zone-of-interests test applies to all causes of action and Plaintiffs cannot evade that requirement by pleading an implied equitable claim. Further, this case presents only statutory, not constitutional issues. Accordingly, the relevant zone of interests is § 8005, not the Appropriations Clause, and Plaintiffs' asserted aesthetic and recreational interests are not within the zone of interests protected by § 8005.

## II.   Section 8005 Authorized DoD's Transfer of Funds.

The Secretary of Defense correctly concluded that the requirements of § 8005 were satisfied in directing the transfer of funds in fiscal year 2020 at issue here. The Secretary determined that the transfers to provide DHS counter-drug support in constructing border barriers were for a "higher

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

8

priority item" than the purposes for which the funds were originally appropriated, because the transferred funds were "excess or early to current programmatic needs." *See* AR at 3–4, 6, 13, 17–21. The Secretary further found that the military requirements to be funded as a result of the transfers were "unforeseen" because the need to provide support for the approved § 284 projects was not known at the time of DoD's fiscal year 2020 budget request. *Id.* at 4, 7, 14. The Secretary also concluded that the item for which the funds were transferred—barrier construction under § 284 in the specific project areas requested by DHS in fiscal year 2020—"has not been denied by Congress." *Id.* at 4, 6, 14.

The Secretary's decision is consistent with the views of the Government Accountability Office (GAO), the independent legislative agency charged with overseeing Executive Branch spending on behalf of Congress. The GAO concluded that DoD acted consistently with § 8005 in transferring and using its "fiscal year 2019 appropriations for the purpose of constructing fences at the southern border of the United States" to support DHS's drug-interdiction efforts. *See* GAO Opinion B-330862, 2019 WL 4200949 (Sept. 5, 2019). The GAO found that DoD's transfer was for an "unforeseen military requirement" under § 8005 because DHS's § 284 request "was unforeseen at the time of [DoD's] budget request and appropriations," and DoD's "authority to support DHS by constructing fences at the southern border under section 284 only materialized when DHS requested DOD's assistance on February 15, 2019, and DoD accepted that request." *Id.* at *6. The GAO also concluded that the item had not been "denied by Congress" because DoD had not requested funds to support DHS, "so there was nothing for Congress to deny with respect to DOD." *Id.* at *8–9 (noting that GAO had "reached similar conclusions in prior opinions"). The GAO's conclusion, which was not before the Court or the Ninth Circuit at the time of the prior decisions, reflects the "expert" view of an independent arm of Congress on fiscal issues that the Court should "prudently consider." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984) (Scalia, J.).

Congress could have prevented the Executive Branch from tapping other sources of funding for border barrier construction. Section 8005 is a provision in DoD's annual appropriations statute that must be renewed every year to remain in force. But Congress did not modify or restrict § 8005 for fiscal year 2020. Instead, Congress reauthorized § 8005 with full awareness of the way in which

DoD had interpreted and utilized § 8005 to fund § 284 border barrier support projects in fiscal year 2019. *See* Department of Defense Appropriations Act, 2019, Pub. L. No. 115-245, § 8005 ("the Secretary of Defense shall notify the Congress promptly of all transfers made pursuant to this authority").   Congress's reauthorization of § 8005 without change thus reflects Congress's acquiescence in DoD's use of § 8005. *See Osborn v. Am. Ass'n of Retired Persons*, 660 F.2d 740, 746 (9th Cir. 1981) ("when Congress subsequently reenacts the statute without significant change, [ ] it is then presumed that the agency interpretation has been implementing the statutory objectives to Congress' satisfaction").

Defendants acknowledge that this Court and the Ninth Circuit concluded that § 8005 did not permit the transfer of funds in fiscal year 2019. *See Sierra Club*, 379 F. Supp. 3d at 912–15; *Sierra Club*, 2019 WL 2715422, at \*3; *Sierra Club*, 929 F.3d at 689–92.   That analysis is inconsistent with the text and context of § 8005, for the reasons explained in Defendants' prior briefs. *See Sierra Club I*, ECF Nos. 64, 146, 181; *Sierra Club et al v. Trump et al.*, Nos. 19-16102 *et al.* (9th Cir.); *Trump v. Sierra Club*, 19A60 (S. Ct.).   The "item" § 8005 refers to cannot be a generic "border wall" or general policy goal, untethered to any particular DoD authority or spending program.   Instead, it can only be an "item" for which DoD could request funding during the process of negotiating the defense budget with Congress.   Here, the relevant "item for which funds are requested" is DoD's counter-narcotics support to DHS under § 284 pursuant to DHS's fiscal year 2020 request for support.   That "item" was not "denied by the Congress."   At no point in the budgeting process did Congress deny a DoD funding request for border-barrier construction under DoD's counter-narcotics support line.

There is also no merit to Plaintiffs' argument that Congress denied § 284 counter-drug funding in fiscal year 2020 when it refused to provide DoD with all of its requested funding for a separate military construction appropriation. *See* Pls.' Motion. at 8–9.   The President's fiscal year 2020 budget proposed a general provision in the Military Construction Appropriations Act that would have provided an additional $9.2 billion in the Military Construction, Army, Appropriation. *See* Budget of the U.S. Government, Fiscal Year 2020 Appendix, § 401 at 329 (Exhibit 2).   In its budget justification submission to Congress, the Army explained that this additional money would be spent on emergency military construction projects necessary to support the use of the Armed Forces at the southern United

States border and funding military construction projects deferred as a result of the fiscal year 2019 military construction pursuant to 10 U.S.C. § 2808.  *See* Department of the Army, Fiscal Year 2020 President's Budget Submission (Mar. 2019) (Exhibit 3).  But the fact that Congress did not include this proposed provision in the fiscal year 2020 Military Construction Appropriations Act, *see* Pub. L. No. 116-94, Div. F, says nothing about whether Congress denied funding to DoD for counter-narcotics support pursuant to § 284 in the DoD Appropriations Act.  *See* FY20 CAA, Div. A, Title VI.  DoD's military construction program is distinct from its counter-drug support to other agencies. They are two entirely separate activities funded by different appropriation statutes and undertaken pursuant to independent statutory authority.  Accordingly, Congress's decision not to fully fund DoD's requested military construction appropriation is not a denial of the "item" at issue in this case, namely counter-drug support pursuant to § 284.

Similarly, the "item" at issue here was "unforeseen."  An expenditure is "unforeseen" under § 8005 if DoD was not aware of the specific need when it made its budgeting request and Congress finalized the DoD appropriation.  DoD submitted its budget request in March 2019 and Congress enacted DoD's fiscal year 2020 appropriations on December 20, 2019.  *See* Pub. L. No. 116-93.  DHS did not request DoD's assistance with the § 284 projects until January 2020, ten months later.  *See* AR at 28–43.  That timing is significant because DoD has no authority to undertake § 284 support until it receives a request from another agency.  10 U.S.C. § 284(a).  Therefore, the need for DoD to provide support to DHS for these projects was not known at the time of DoD's budget request in 2019.  *See* GAO Opinion B-330862, 2019 WL 4200949 at *6 ("[T]he question under Section 8005 is whether [the requirement] was unforeseen at the time of [DoD's] budget request.").

### III.    DoD's Use of § 284 Counter-Drug Support Authority is Lawful.

Plaintiffs urge the Court to address various arguments about DoD's use of § 284, *see* Pls.' Motion at 9–13, but there is no need for the Court to address those questions if the Court adheres to its prior conclusion that a ruling as to § 8005 "obviates the need to independently assess the lawfulness of Defendants' invocation of Section 284."  *Sierra Club*, 2019 WL 2715422, at *3; *see Sierra Club*, 379 F. Supp. 3d at 918 n.19.  The fiscal year 2020 projects, like the fiscal year 2019 projects, are funded entirely by a transfer pursuant to § 8005.

In the event the Court decides to address § 284, Plaintiffs' claims fail at the outset because they fall outside the zone of interests of § 284.  Section 284's limitations on when DoD can provide counter-drug support are designed to regulate the relationship between Congress, DoD, and state or federal agencies seeking assistance, based on budgetary control and agency priorities.  The "interests protected by the" statute are completely unrelated to the recreational and aesthetic interests that Plaintiffs seek to vindicate here.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014).  Moreover, nothing in § 284 suggests that Congress intended to provide environmental organizations with a remedy for protecting against the alleged negative externalities of barrier construction.

It is not enough for Plaintiffs to assert that barrier construction will harm their interests.  The Supreme Court has made clear that the Article III injury analysis is distinct from the zone-of-interests analysis.  *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–77 (2011) ("If any person injured in the Article III sense by a [statute] could sue, absurd consequences would follow.").  The mere fact that Plaintiffs allege injuries traceable to § 284 construction is insufficient.  *See id.* (identifying hypothetical persons with Article III injuries from statutory violations who plainly would be improper plaintiffs to enforce the statute).  Here, Plaintiffs cannot make the required showing that their recreational and aesthetics interests fall into the category of interests protected by § 284.  *See Ctr. for Biological Diversity*, 2020 WL 1643657, at *18–19 (concluding that environmental plaintiffs fall outside the zone of interests of § 284).

The Supreme Court's decision in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) does not support Plaintiffs' position.  *See* Pls.' Motion at 9–10.  *Patchak* involved an APA challenge to the Secretary of the Interior's statutory authority "to acquire property 'for the purpose of providing land for Indians.'"  567 U.S. at 211-12.  The "context and purpose" of that statue served "to foster Indian tribes' economic development," and authorized the Secretary of the Interior to "take[] title to properties" on behalf of Indian tribes "with at least one eye directed toward how tribes will use those lands."  *Id.* at 226.  The Supreme Court held that the plaintiff, a neighboring landowner "alleg[ing] economic, environmental, and aesthetic harms from the [tribe's planned] casino's operation," was within the zone of interests of the statute.  *Id.* at 212.  The Court

reasoned that, because of the statutory purpose, the Secretary "typically acquire[s] land with its eventual use in mind [and] after assessing potential conflicts that use might create." *Id.* at 227. Accordingly, the Court concluded that the regulation of the *acquisition* of land was "closely enough and often enough entwined with" the *use* of land being acquired that "neighbors to the use" were "reasonable—indeed, predictable—challengers of the Secretary's [land-acquisition] decisions." *Id.* at 227-28.

By contrast, § 284's authorization for DoD to provide counter-narcotics support to DHS does not protect or regulate Plaintiffs' asserted environmental, aesthetic, or recreational interests. Further, § 284's limitations on the circumstances in which DoD can provide border barrier support to DHS is not "entwined" with the downstream collateral effects on private parties that may result from such counter-drug support. Plaintiffs emphasize their interest in the border lands on which construction will occur, but *Patchak* "does not automatically place any plaintiff with an interest in the land affected by a statute within that statute's zone of interests." *Ctr. for Biological Diversity*, 2020 WL 1643657, at *19 (distinguishing *Patchak*). Unlike *Patchak*, the interests that Plaintiffs seek to protect here are not congruent or aligned with the interests Congress sought to protect in § 284. Consequently, Plaintiffs' lawsuit is "more likely to frustrate than to further [the] statutory objectives" of § 284. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987). "The purpose of the 'zone of interests' test is 'to exclude those plaintiffs'" who bring such suits. *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (quoting *Clarke*).

Even if Plaintiffs could assert a cause of action to enforce § 284, DoD's construction of the barrier projects at issue fall squarely within its counter-drug support authority. Plaintiffs do not dispute that the projects at issue were approved in accordance with § 284's procedural requirements, *id.* § 284(a), (a)(1)(A), and encompass the type of border infrastructure construction permitted by the statute, *id.* § 284(b)(7). Plaintiffs likewise do not dispute that the projects at issue are being constructed in "drug smuggling corridors" along the U.S.-Mexico border. 10 U.S.C. § 284(b)(7). *See supra* at 4–5.

Instead, Plaintiffs contend that DoD has exceeded the level of support that it may provide under § 284. *See* Pls.' Motion at 10–13. But the text and history of § 284 contradict Plaintiffs' claim that Congress impliedly limited DoD's support authority under the statute. No monetary restriction

appears in the types of support permitted under § 284.  *See* 10 U.S.C. § 284(b)-(c).  To the contrary, the statute broadly approves "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States" without regard to the size, scale, or budget of the project.  *Id.* § 284(b)(7).

Plaintiffs point to the requirement under Section 284(h) that the Secretary must give Congress 15 days' written notice before engaging in "small scale construction," which the statute defines as construction "not to exceed $750,000."  *Id.* § 284(h)(1)(B), (i)(3).  That notice requirement, of course, does not expressly prohibit larger construction, and it also provides no basis to infer that Congress intended to limit the support authorized under Section 284 to "small scale construction."  Indeed, certain types of support authorized under § 284 explicitly refer—*but are not limited*—to "small scale" or "minor" construction.  *See* 10 U.S.C. § 284(b)(4) (authorizing "[t]he establishment (*including an unspecified minor military construction project*) and operation of bases of operations or training facilities for the purpose of facilitating counterdrug activities . . . within or outside the United States" (emphasis added));  *id.* § 284(c)(1)(B) (authorizing "[t]he establishment (*including small scale construction*) and operation of bases of operations or training facilities for the purpose of facilitating counterdrug activities . . . outside the United States" (emphasis added)).  Contrary to Plaintiffs' suggestion, there is nothing inherently implausible about Congress choosing to require notice for some, but not all, projects that DoD could construct under § 284.  Congress could reasonably have concluded, for example, that it would be unlikely to be made independently aware of small-scale construction projects, rendering a notice requirement uniquely necessary in that context.  If Congress wanted to limit all § 284 construction to "small scale construction," it could have and "presumably would have done so expressly."  *Russello v. United States*, 464 U.S. 16, 23 (1983).  "The short answer is that Congress did not write the statute that way."  *Id.*

Plaintiffs' argument also cannot be reconciled with § 284's history. Since Congress first provided Section 284's support authority, DoD has repeatedly used that authority, with Congress's explicit approval, to complete large-scale fencing projects along the southern border in support of DHS's counter-drug activities.  For example, under authority of the first counter-drug activities support appropriation, DoD built a 14-mile fence in a drug smuggling corridor along the San Diego-

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

14

Tijuana border—a project Congress described as "precisely the kind of federal-local cooperative effort the Congress had in mind" in enacting such authority. H.R. Rep. No. 103-200, at 330-31 (1993). As of 2006, Congress reported with approval that, since 1990, DoD's use of its authority to support counterdrug activities through "construction and rehabilitation" along the southern border "resulted in 7.6 miles of double-layer fencing, 59 miles of single fencing, and 169.5 miles of road." H.R. Rep. No. 109-452, at 368 (2006). And in determining appropriations for these construction activities, Congress recommended that DoD spend millions of dollars on specific border projects with regular annual increases. *See, e.g.*, *id.* at 369 (recommending a $10 million increase in DoD's budget for fence and road construction on the southern border); *see also* H.R. Rep. 110-652 at 420 (2008) (recommending $5 million increase); H.R. Rep. 110-146 at 385–86 (2007) (recommending $8 million increase).

Plaintiffs' contend that these prior projects are not comparable in size to the projects at issue in this case, *see* Pls.' Motion at 13, but they cannot dispute that Congress approved of DoD's prior barrier construction under § 284 in amounts substantially greater than the $750,000 limit they seek to infer from the congressional notification requirement. *See* 10 U.S.C. § 284(h)(1)(B), (i)(3). The dispute here is not whether § 284 authorizes the type of fence-building "support" DoD is providing. Rather, Plaintiffs object to the amount or extent of such support. But it would be entirely arbitrary for the Court to create some unspecified monetary limit on DoD's § 284's authority out of whole cloth, as nothing in the statute even arguably defines any upper limit.

Nor is there any merit to Plaintiffs' argument that § 284 grants DoD the authority to "short-circuit the political process" that resulted in Congress's decision to appropriate funding for border barriers at specified levels. *See* Pls.' Motion at 11–10. The entire purpose of § 284 is to permit DoD to use its own appropriated funds to support DHS through the construction of barriers to block drug-smuggling corridors. Plaintiffs' interpretation of § 284 would render the entire provision a nullity, as DoD would be prohibited from providing such authorized support under § 284 in any year in which Congress appropriates funds to DHS specifically for border fence construction. *See Hughes Air Corp. v. Public Util. Comm'n*, 644 F.2d 1334, 1338 (9th Cir. 1981) (avoiding construction that rendered statute meaningless). There is no evidence Congress intended that result and the long history of Congress's

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

15

support for § 284 construction refutes Plaintiffs' position.

For similar reasons, the Court should also reject Plaintiffs argument that DoD's § 284 support is constrained by Congress's appropriations to DHS in the FY20 CAA. *See* Pls.' Motion at 12–13. There is no basis to conclude that the CAA, a statute appropriating funds to *DHS*, impliedly prohibits *DoD* from relying on its own previous appropriations and independent counter-narcotics support authority under § 284. *See Sierra Club I*, ECF Nos. 64, 181. The plain text of the FY20 CAA appropriated funds to a specific account within DHS's budget, and specified how the funds *in that DHS account* were to be used. *See* FY20 CAA, Div. A, § 209. That provision in no way precludes DoD from using its own separately appropriated funds to construct counter-drug fence projects pursuant to DoD's own statutory authority under § 284. Plaintiffs rely on the Supreme Court's statement in *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, (2000), that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." But that canon of statutory construction for evaluating *Chevron* deference challenges has no application here because Congress has not directly spoken to whether the funding to DHS in the CAA precludes use of § 284 authority. The CAA does not address § 284 support at all, let alone "specifically address the topic at hand." *Id.* at 143. Moreover, the fact that Congress expressly considered, but refused to enact into law, various proposals to limit DoD's use of § 284 authority in fiscal year 2020 further underscores that the CAA should not be interpreted as an implied silent restriction on that authority. *See supra* at 3.

## IV.   Plaintiffs' Remaining Statutory and Constitutional Arguments Lack Merit.

Plaintiffs also reassert the same arguments they presented in prior briefing in *Sierra Club I* that Defendants' actions violate the CAA, the National Environmental Policy Act, and the Constitution. *See* Pls.' Motion at 13 n.3. Defendants' similarly reassert the same arguments that funding and construction of the § 284 projects do not violate these statutory provisions or the Constitution. *See Sierra Club I* (ECF Nos. 64, 146, 181, 236, 247); *Sierra Club et al v. Trump et al.*, Nos. 19-16102 *et al.*, 19-17501 *et al.* (9th Cir.); *Trump v. Sierra Club*, 19A60 (S. Ct.).

## V.   Plaintiffs Have Not Met the Requirements for a Permanent Injunction.

The Court should deny Plaintiffs' request for a permanent injunction because the balance of

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

16

equities tips decisively in favor of Defendants.  Indeed, in staying this Court's prior § 284 injunction, the Supreme Court has already determined that the harm to the Government from an injunction prohibiting § 284 border-barrier construction outweighs the aesthetic, recreational, and environmental interests advanced by Plaintiffs.  *See Trump*, 140 S. Ct. at 1.  Such stays may issue only if the applicant satisfies all four stay factors, including that the balance of the harms and the public interest favors a stay.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (reciting stay factors).  The interests that Plaintiffs assert in this case are indistinguishable from those they advanced in the prior litigation and the balance once again favors Defendants, as the Supreme Court necessarily recognized.  *See Trump*, 140 S. Ct. at 1 ("*Among the reasons* [for the stay] is that the Government has made a sufficient showing . . . that the plaintiffs have no cause of action.") (emphasis added).

The Supreme Court recognized a similar lopsided balance of equities in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), reversing a preliminary injunction prohibiting the Navy from using sonar technology in training exercises at sea, where plaintiffs claimed the sonar would injure them because they "observ[ed]" and "photograph[ed]" marine mammals in the area and "conduct[ed] scientific research."  555 U.S. at 13-14, 25-26.  In reversing, the Supreme Court explained that "the District Court and the Ninth Circuit significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense," which "plainly outweighed" the harms asserted by the plaintiffs.  *Id.* at 24, 33.  And the Court explained that its "analysis of the propriety of preliminary relief [wa]s applicable to any permanent injunction as well," which requires consideration of the same equitable factors.  *Id.* at 33.  Plaintiffs' interests here are even less substantial than those in *Winter* and the balance of equities likewise plainly bars injunctive relief.  *See id.* at 32 (permanent "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *see also See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) ("Permanent "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found.").

**A.  An Injunction Will Impose Substantial and Irreparable Harm on Defendants.**

DHS identified the barrier projects at issue because of the high rates of drug smuggling

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

17

between ports of entry in those areas of the border.  The record includes ample evidence of the severity of the problem; the limited effectiveness of the outdated barriers in those areas, which transnational criminal organizations have adjusted their tactics to evade; and the need for new barriers in areas where none currently exist.  *See supra* at 4–5.  The Supreme Court has recognized that the Government has "compelling interests in safety and in the integrity of our borders," *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989), but a permanent injunction would prohibit the Government from taking critical steps needed to prevent the continuing surge of illegal drugs from entering the country through the southern border.  *See United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009) (acknowledging the government's "strong interest[]" in "interdicting the flow of drugs").

An injunction would also permanently prohibit DoD from obligating approximately $2.2 billion it has transferred for these projects but has not yet obligated toward construction contracts. *See* Declaration of Andrew J. Short ¶ 8 (Exhibit 3).  Unless those funds are obligated by September 30, 2020, this money will no longer remain available to DoD.  *See id.*[6]  In addition, a permanent injunction would force DoD to incur millions of dollars of unrecoverable fees and penalties to its contractors for each day that work is suspended—costs that DoD would not have to pay but for an injunction.  *See id.* ¶¶ 9–22.  DoD will have to pay these additional, unnecessary costs from the finite funds available for § 284 border barrier construction, thus diminishing the money available for actual border barrier construction and harming the ability to complete the projects.  *See id.* ¶¶ 9, 20.

### B.  Defendants' Interests Decisively Outweigh Plaintiffs' Recreational and Aesthetic Interests.

Defendants' harms "plainly outweigh[]" Plaintiffs' alleged aesthetic and recreational injuries. *Winter*, 555 U.S. at 26, 33.  Plaintiffs assert the same interests that the Supreme Court determined were insufficient to grant a stay in the prior litigation and those interests are equally insufficient to grant a permanent injunction here.

---

[6] The fact that a majority of the Supreme Court specifically rejected a narrower stay that would have been solely limited to the expiration of funding in fiscal year 2019 further reinforces that the balance of equities favors Defendants.  *See Trump v.*, 140 S. Ct. at 1–2 (Breyer, J., concurring in part and dissenting in part from grant of stay).

As in the earlier rounds of litigation, the common thread of Plaintiffs' alleged harms are their claims that their members' aesthetic and recreational interests are harmed because their members have asserted that they do not want to see a new border barrier when they are recreating or participating in other activities along the international border. *See generally* Pls.' Motion at 13-19. While such assertions are easy to make, and this Court has credited them in past decisions, Plaintiffs' allegations of aesthetic and recreational injuries are plainly exaggerated and speculative and should be rejected.

As a general matter, the vast majority of the construction activity and the footprints of the projects themselves will occur within a narrow construction corridor that parallels the international border that is previously disturbed, includes existing barriers and roads, and functions primarily as a law enforcement zone. *See* Enriquez Decl. ¶¶ 13, 51, 66, 80, 89, 97, 99. Construction will not impact land uses in the thousands of acres surrounding the limited project areas, where the forms of recreation Plaintiffs enjoy will remain possible. *See id.* ¶ 80.

For instance, several of Plaintiffs' members allege that their aesthetic and recreational interests will be harmed by the El Centro Project. *See, e.g.*, Ervin Decl. ¶ 6; Harmon Decl. ¶ 15; Ramirez ¶¶ 5–6; Rood ¶ 7–8. These members allege that the project will detract from the beauty of the surrounding areas, even going so far as asserting that the project will cause "unfathomable destruction" to an area called Myer Valley. Ervin Decl. ¶ 8. But the El Centro Project at issue here has been reduced to approximately three miles, Enriquez Decl. ¶¶ 5, 18. The revised barrier alignment is four miles or more from Myer Valley. It is also four miles or more away from other areas on which Plaintiffs base their claims of harm such as Blue Angel's Peak, Valley of the Moon, and Desert View Tower. *Id.* ¶¶ 77–78. Plaintiffs offer no credible or competent evidence that the Project will substantially impact these areas visited by their members, let alone that the Project will cause "unfathomable destruction" to these areas.

Similarly, Plaintiffs assert that the San Diego Projects will "be visible for miles" along the Pacific Crest Trail and be a "constant" reminder of the "hectic world," Rood Decl. ¶ 10, without submitting any competent evidence that this will in fact be the case, particularly when considering that 14 of the 17 miles of the Projects will be replacing existing 18-foot fencing. Enriquez Decl. ¶ 73. With regard to the Yuma Projects, Plaintiffs falsely claim that the Projects will cut off roads and "views

of the landscape" and "completely obstruct" views on scenic drives, Terry Decl. ¶¶ 17, 20, when in fact this will not be the case. *See* Enriquez Decl. ¶¶ 81–86 (explaining errors in Plaintiffs' rationale). Moreover, Plaintiffs do not allege that they recreate on or near the Yuma B project area on the Quechan Indian Reservation. *See* Terry Decl. ¶¶ 18–21. Their alleged injury is limited solely to asserting that construction on the Reservation will make the declarant "less interested in taking scenic drives" in the area. *Id.* ¶ 20. But that asserted injury cannot outweigh Defendants' compelling interest in stopping illegal drugs from entering the country.

Plaintiffs assert that the Tucson Projects will be a "giant scar on the landscape," will "destroy the reason" they recreate in the area and prevent them from hiking there, will "take away" their members' ability to recreate in open wilderness, will "destroy" their ability to visit and enjoy the borderlands, and may "destroy" or devastate a diverse landscape and beauty. Ardovino Decl. ¶¶ 8–9, 12; Roberts Decl. ¶ 8; Caruthers Decl. ¶ 10; Brun Decl. ¶ 14; Whitaker ¶ 9. The Court cannot rely on these conclusory assertions that grossly exaggerate the potential impacts the projects may have on the landscape, as the large swaths of relatively undisturbed lands that Plaintiffs' members allege they recreate on will not be materially impacted by the small footprint of the projects, which will be almost entirely confined to an existing 60-foot strip of land along the international border that already functions as a law enforcement zone. Enriquez Decl. ¶¶ 88–89.

Plaintiffs' allegations about aesthetic and recreational impacts from the El Paso and Del Rio Projects fare no better. Plaintiffs' members assert that the El Paso Projects will injure them because the bollard-style fencing will be a "menacing symbol," will do violence to their daily life and the "natural lands" they seek to protect, will "look completely out of place sprouting from the mountainside" on Mount Cristo Rey, and will ruin the bootheel region of New Mexico, an area they say they treasure. LoBello Decl. ¶ 10; Ackerman Decl. ¶ 8; Dash Decl. ¶¶ 10-14; Bixby Decl. ¶¶ 11-13. These allegations ignore the facts that approximately 41 of the approximately 41.5 miles of fencing constructed as part of El Paso A and El Paso D will replace existing fencing and will not increase any law enforcement presence (as Plaintiffs repeatedly and erroneously claim throughout their allegations for all projects), and that no segments of the projects will be constructed on Mount Cristo Rey or in the New Mexico bootheel. Enriquez Decl. ¶¶ 90–97 (rebutting Plaintiffs' allegations about the El

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

20

Paso Projects).  And contrary to Plaintiffs' erroneous assertions (Thompson Decl. ¶ 18), the Del Rio Projects will not materially impact access to the Rio Grande or change any land uses in the area. Enriquez Decl. ¶¶ 98–99.

The lack of credible and competent evidence in support of Plaintiffs' allegations of irreparable harms related to wildlife species is even more telling.  Plaintiffs assert that the El Centro Project will be "deadly" to endangered Peninsular bighorn sheep by preventing them from migrating across the international border.  Ervin Decl. ¶ 10; Harmon Decl. ¶ 13.  These assertions do not account for the fact that the Project has been reduced to three miles, leaving large gaps for sheep migration.  *See* Enriquez Decl. ¶ 49; *see also* Defs.' Mot. for Summ. Judgment at 18–19 (ECF No. 62), *California et al. v. Trump et al,* 20-CV-1563-HSG.  Plaintiffs allege that Tucson C will destroy "essential" habitat for the endangered masked bobwhite and project activities will stress the skittish bird.  Brun Decl. ¶ 10.  Construction of Tucson C, however, will be confined to the highly-disturbed law enforcement corridor that is far from qualifying as habitat for the bobwhite, let alone "essential" habitat.  Enriquez Decl. ¶ 51.  Moreover, to the extent that any bobwhite are in the area during the short construction period, CBP will survey the area and implement measures to minimize any temporary disturbances to the species.  *Id.*

Plaintiffs also allege that the Tucson and El Paso Projects will impede recovery of the jaguar and Mexican gray wolf by impairing the species' ability to migrate across the international border. Brown Decl. ¶ 9; Brun Declaration ¶ 7; Whitaker Decl. ¶ 6; Bixby Decl. ¶ 8.  The Tucson Projects will leave large gaps allowing for possible jaguar migration in Arizona, and none of the El Paso Projects will occur in the bootheel region of New Mexico, which also supports a potential migration route. Enriquez ¶ 54.  These same migration corridors may be used by the Mexican wolf and, more importantly, in its Recovery Plan for the Mexican wolf, the U.S. Fish and Wildlife Service determined that connectivity and migration between the experimental population in the United States and the population in Mexico is not necessary to recovery of the Mexican wolf.  *Id.* ¶¶ 56–58; *see also* Defs.' Mot. for Summ. Judgment at 20 (ECF No. 62), *California et al. v. Trump et al,* 20-CV-1563-HSG.  There is thus no evidence before the Court to support a conclusion that any of the projects at issue here will

*Sierra Club, et al. v. Donald J. Trump, et al.*, 4:20-cv-01494-HSG – Defs.' MSJ & Opp'n re: FY20 § 284

21

harm the jaguar or Mexican wolf.[7]

In this round of briefing, Plaintiffs claim a new basis for irreparable harm, alleging that the Del Rio Projects threaten harm to archaeological resources. *See* Pls.' Motion at 16–17. Plaintiffs adduce no evidence that the Projects will actually harm any archaeological sites, but instead misleadingly claim that a National Park Service survey supports a conclusion that "numerous archaeological sites 'likely will be wholly or partially destroyed by the forthcoming border fence construction.'" *Id.* at 17 (quoting RJN ¶ 5, Ex. 5 at 17). The Park Service's survey, however, concerned entirely different projects in Arizona, on the southern border of Organ Pipe Cactus National Monument, whereas the Del Rio Projects are two states to the east, in Texas. Enriquez Decl. ¶ 30. Thus, the survey is of no relevance here. In any event, all but two of the resources identified in the Park Service's survey were not in the Project Areas, were not appropriate for data recovery or excavations, but had already been recorded. Enriquez Decl. ¶70. The remaining two sites were investigated further by CBP, which implemented appropriate mitigation measures in conjunction with the Park Service. *Id.* CBP will implement the same measures to identify and protect any possible cultural and archaeological resources associated with the Del Rio Projects, which will be constructed in the footprint of existing pedestrian fences. *Id.* ¶¶ 31, 70. Plaintiffs cannot establish irreparable harm based on any cognizable impacts to archaeological resources.

In sum, even if the Court were to conclude that Plaintiffs have asserted a valid claim under § 8005, Plaintiffs have failed to establish that the extraordinary and drastic remedy of an injunction is appropriate here. As the Supreme Court has repeatedly emphasized, Plaintiffs must carry their burden of persuasion by making a "*clear showing*" based on "substantial proof." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *see Winter*, 555 U.S. at 22. Plaintiffs' declarations are filled with speculation, conclusory allegations, and assertions that are simply at odds with reality, falling far short

---

[7] Plaintiffs' allegations that the projects will harm a whole host of other wildlife species are similarly misplaced and contrary to existing evidence. *See* Enriquez Decl. ¶¶ 59–66. Indeed, CBP will be incorporating openings for small animals into the fencing at locations recommended by the resource agencies, further mitigating any interference with cross-border movements at key areas. *Id.* ¶¶ 60, 62. Similarly, Plaintiffs' concerns about potential flooding are equally misplaced, given various design and mitigation measures in the construction plans. *See id.* ¶¶ 67–68.

of Plaintiffs' burden of making a "clear showing" of irreparable harm.  And, given the lopsided balance of equities in favor of the United States' important interest in protecting the integrity of the Nation's border and stopping the flow of illegal drug from entering the country, Plaintiffs' unsubstantiated claims of aesthetic and recreational harms provide no basis for the Court to award a permanent injunction in this matter.[8]

## VI.     The Court Should Stay Any Injunction Pending Appeal.

The Supreme Court's stay of this Court's prior injunction against the § 284 projects "appears to reflect the conclusion of a majority of that Court that the challenged construction should be permitted to proceed pending resolution of merits." *California*, 407 F. Supp. 3d at 907; *see Sierra Club v. Trump*, No. 19-17501 (9th Cir. Dec. 30, 2019) (quoting same).  In light of that decision, the Court should follow the same approach it took in the § 2808 litigation and stay any injunction pending appeal. *See California*, 407 F. Supp. 3d at 907; *Trump*, 140 S. Ct. at 1.

Like this Court, the Ninth Circuit has recognized the impact of the Supreme Court's stay.  The Ninth Circuit denied the Plaintiffs' motion to lift the stay of the Court's § 2808 injunction without prejudice, in part because "the Supreme Court has already stayed an injunction previously granted by the district court in this case," but also in part because a nationwide injunction against the § 2808 construction had been entered in a parallel suit in the U.S. District Court for the Western District of Texas.  *See Sierra Club*, No. 19-17501 (9th Cir. Dec. 30, 2019).  After the Fifth Circuit stayed that nationwide injunction, the Plaintiffs promptly filed a renewed emergency motion to lift the stay in December 2019, but that motion remains pending and the stay remains in place over four months later.

On the merits, the Supreme Court's conclusion in its prior stay order fully applies to this case: "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action

---

[8] In awarding Plaintiffs a permanent injunction in the prior § 284 litigation, the Court concluded that Congress had already balanced the equities in Plaintiffs' favor through passage of the fiscal year 2019 CAA.  *See Sierra Club*, 2019 WL 2715422 at *5.  That holding is contrary to the Supreme Court's stay decision.  Further, in appropriating funds to DHS in the FY 2020 CAA, Congress did not express any opinion about the equitable balance between Defendants' border security interests and the particular harms asserted by these Plaintiffs as to their aesthetic and recreational interests.  In no event did the FY20 CAA preordain the equitable balancing required for a permanent injunction.

to obtain review of the Acting Secretary's compliance with Section 8005." *Trump*, 140 S. Ct. at 1. Further, the Supreme Court's stay decision reflects a determination that the balance of the harms and the public interest support a stay, and that balance is substantially identical here. *See Nken*, 556 U.S. at 434; *see also supra* at 16–17. Indeed, Plaintiffs assert the same recreational and aesthetic injuries that they unsuccessfully advanced to the Supreme Court. The Supreme Court granted a stay over those objections and there is no basis for this Court to reach a different decision here. Accordingly, the Court should stay any injunction pending appeal.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion for partial summary judgment, deny Plaintiffs' motion for partial summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of fiscal year 2020 § 284 projects. A proposed order is attached.

DATE: May 1, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources
Division

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER
(CA Bar No. 313188)
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0238
Fax: (202) 305-0506
Email: tyler.alexander@usdoj.gov

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Andrew I. Warden*
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel

KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470
Email:  Andrew.Warden@usdoj.gov

*Attorneys for Defendants*